No. 49 August 7, 2014 759

IN THE SUPREME COURT OF THE
STATE OF OREGON

STATE OF OREGON,
*Respondent on Review,*

*v.*

LINDA DIANE FESSENDEN,
*Petitioner on Review.*

(CC 10CR2252MI; CA A150065; SC S061740 (Control))

STATE OF OREGON,
*Respondent on Review,*

*v.*

TERESA ANN DICKE,
*Petitioner on Review.*

(CC 10CR2251MI; CA A150092; SC S061770)

En Banc

On review from the Court of Appeals.*

Argued and submitted May 6, 2014.

Elizabeth Daily, Deputy Public Defender, Salem, argued the cause and filed the briefs for petitioner Fessenden. With her on the briefs was Peter Gartlan, Chief Defender.

Rankin Johnson IV, Law Office of Rankin Johnson IV, LLC, Portland, argued the cause and filed the briefs for petitioner Dicke.

Pamela Walsh, Assistant Attorney General, Salem, argued the cause for respondent on review. With her on the briefs were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Lora Dunn, Animal Legal Defense Fund, Portland, filed a brief for *amici curiae* Animal Legal Defense Fund,

_____

* Appeals from Douglas County Circuit Court, George William Ambrosini, Judge. 258 Or App 639, 310 P3d 1163 (2013). 258 Or App 678, 310 P3d 1170 (2013).

National District Attorneys Association, and Association of Prosecuting Attorneys.

WALTERS, J.

The decisions of the Court of Appeals and the judgments of the circuit court are affirmed.

**WALTERS, J.**

In these consolidated criminal appeals, we consider whether an officer violated Article I, section 9, of the Oregon Constitution or the Fourth Amendment to the United States Constitution when, without a warrant, he entered private property, seized an emaciated horse, and took the horse to a veterinarian. We conclude that the officer acted lawfully because he had probable cause to believe that defendants were committing the crime of animal neglect and reasonably believed, based on specific articulable facts, that immediate action was necessary to prevent further imminent harm to and the death of the horse. We affirm the decisions of the Court of Appeals. *State v. Fessenden*, 258 Or App 639, 310 P3d 1163 (2013); *State v. Dicke*, 258 Or App 678, 310 P3d 1170 (2013).

Because the jury convicted defendants, we recite the facts in the light most favorable to the state. *State v. Lewis*, 352 Or 626, 628, 290 P3d 288 (2012). Codefendants Fessenden and Dicke jointly owned a horse, which they kept on Dicke's property. Dicke's neighbors called the sheriff's office to report that the horse appeared to be starving. An officer with specialized training in animal husbandry and in investigating animal cruelty was dispatched to investigate. To reach Dicke's property, the officer drove up a common driveway shared by Dicke and her neighbors. The horse was kept in a pasture in plain view of the shared driveway.

From the driveway, the officer observed that the horse's backbone protruded, her withers stood up, her neck was thin, all of her ribs were visible, she had no visible fatty tissue in her shoulders, and she was "swaying a little bit," all of which the officer recognized as signs of emaciation. The horse also was straining to urinate, which the officer recognized as a sign of kidney failure (a potential result of starvation). At that point, before entering defendant's property, the officer believed that the horse was suffering from malnourishment and presented a medical emergency. The officer testified that the horse was "literally *** the thinnest horse I've seen that was still on its feet," that the horse was at risk of her "internal organs *** shutting down," and that the officer was "afraid it was going to fall over and not

be able to get back up." The officer knew that when emaciated horses fall, they frequently have to be euthanized.

Given the horse's condition, the officer believed that defendants were committing the crime of first-degree animal neglect. He also believed that it would take between four and eight hours to obtain a warrant to go onto defendant's property and that, during that interval, the horse might fall, resulting in its death. He therefore entered the property, seized the horse, and immediately took her to a veterinarian. The veterinarian determined that the horse was starving and needed immediate medical treatment.

Defendant Dicke was charged with first-degree animal neglect, ORS 167.330, and first-degree animal abuse, ORS 167.320.[1] Defendant Fessenden was charged with second-degree animal neglect, ORS 167.325.[2]

Defendants' trials were consolidated, and both defendants moved to suppress evidence obtained as a result of the officer's seizure of the horse.[3] They argued that the officer's acts violated the warrant requirements of Article I, section 9,

---

[1] The legislature revised the animal welfare statutes, ORS chapter 167, in 2013. *See* Or Laws 2013, ch 719. Because defendants were charged before those revisions, we cite to the 2009 versions of the relevant statutes in discussing the elements of the crimes with which defendants were charged.

In 2009, ORS 167.330 provided, in part:

"(1) A person commits the crime of animal neglect in the first degree if, except as otherwise authorized by law, the person intentionally, knowingly, recklessly or with criminal negligence fails to provide minimum care for an animal in the person's custody or control and the failure to provide care results in serious physical injury or death to the animal."

ORS 167.320 provided, in part:

"(1) A person commits the crime of animal abuse in the first degree if, except as otherwise authorized by law, the person intentionally, knowingly or recklessly:

"(a) Causes serious physical injury to an animal; or

"(b) Cruelly causes the death of an animal."

[2] In 2009, ORS 167.325 provided, in part:

"(1) A person commits the crime of animal neglect in the second degree if, except as otherwise authorized by law, the person intentionally, knowingly, recklessly or with criminal negligence fails to provide minimum care for an animal in such person's custody or control."

[3] Each defendant filed a separate motion to suppress. Defendant Dicke identified the evidence to be suppressed as "all observations of the horse." Defendant Fessenden moved to suppress "all fruits of said search and seizure including any information, material or knowledge gained *** includ[ing] any examination of

of the Oregon Constitution and the Fourth Amendment to the United States Constitution. In response to the state's argument that two exceptions to that requirement—the emergency aid and the exigent circumstances exceptions— permitted the officer's entry and seizure, defendants contended that neither exception permits an officer to act without a warrant to provide aid to an animal. Further, defendants argued, even if one of the cited exceptions applied, the state had not proved that the horse was in imminent danger.

The trial court denied defendants' motions to suppress, concluding that both exceptions to the warrant requirement permitted the officer's acts. The jury convicted both defendants of the charged crimes, and the court entered separate judgments against each defendant. Defendants separately appealed, reprising their trial court arguments, and, in both cases, the Court of Appeals affirmed.

In *Fessenden*, the Court of Appeals held that the officer's warrantless entry and seizure were lawful under the emergency aid exception to the warrant requirement of Article I, section 9. 258 Or App at 640. The court cited this court's decision in *State v. Baker*, 350 Or 641, 649, 260 P3d 476 (2011), for the proposition that officers may enter property without a warrant if they "'have an objectively reasonable belief, based on articulable facts, that a warrantless entry is necessary to either render immediate aid to persons, or to assist persons who have suffered, or who are imminently threatened with suffering, serious physical injury or harm.'" *Fessenden*, 258 Or App at 640. The court concluded that animals were included in the class of "persons" that officers may aid without a warrant:

> "[T]he societal interest in protecting nonhuman animals from unnecessary pain, injury, trauma, and cruel death can justify *** a warrantless search or seizure aimed at preventing or alleviating that suffering. *** [W]e hold that a warrantless search or seizure is justified when law enforcement officers have an objectively reasonable belief, based on articulable facts, that the search or seizure is necessary to render immediate aid or assistance to animals that have suffered, or which are imminently threatened

the horse, photographs, body condition score, other observations of and statements about the condition of the horse."

with suffering, serious physical injury or cruel death, unless that injury or death is being inflicted lawfully."

*Id*. at 649.

In *Dicke*, the Court of Appeals cited its reasoning in *Fessenden* and decided, in a per curiam opinion, that the officer did not violate Article I, section 9. 258 Or App at 679. The court also relied on the emergency aid exception to the federal constitution to reject Dicke's Fourth Amendment argument. *Id*. at 680.

Both defendants petitioned this court for review, asserting that the officer's entry and seizure violated the state and federal constitutions.[4] We consolidated the cases and begin our analysis with the state constitution and the text of Article I, section 9, which provides:

> "No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure; and no warrant shall issue but upon probable cause, supported by oath, or affirmation, and particularly describing the place to be searched, and the person or thing to be seized."

"Under Article I, section 9, warrantless entries and searches of premises are *per se* unreasonable unless falling within one of the few 'specifically established and well-delineated exceptions' to the warrant requirement." *Baker*, 350 Or at 647 (quoting *State v. Davis*, 295 Or 227, 237, 666 P2d 802 (1983)).

One such exception allows for warrantless entries, searches, and seizures to provide emergency aid. In *Baker*, this court held that a warrantless entry into a residence was lawful because the officers reasonably believed that someone inside was being assaulted:

> "[U]nder certain circumstances, the need to render emergency aid or prevent serious injury or harm is an appropriate justification for an immediate warrantless entry under

---

[4] The state acknowledges that defendant Dicke preserved her Fourth Amendment argument, but suggests that defendant Fessenden may have failed to do so because she did not specifically raise that issue in the Court of Appeals. Because we reject Dicke's Fourth Amendment argument on the merits, we also reject Fessenden's corresponding argument and do not specifically address the issue of preservation. Even if Fessenden's Fourth Amendment argument were preserved, it would fail on the merits.

> Article I, section 9. Consequently, we conclude that an emergency aid exception to the Article I, section 9, warrant requirement is justified when police officers have an objectively reasonable belief, based on articulable facts, that a warrantless entry is necessary to either render immediate aid to persons, or to assist persons who have suffered, or who are imminently threatened with suffering, serious physical injury or harm."

*Id*. at 649 (footnotes omitted). Another exception to the warrant requirement allows for search or seizure under exigent circumstances, articulated by this court as "a situation that requires the police to act swiftly to prevent danger to life or serious damage to property, or to forestall a suspect's escape or the destruction of evidence." *State v. Stevens*, 311 Or 119, 126, 806 P2d 92 (1991) (when officers are "presented with both probable cause to believe that a crime had occurred and an exigent circumstance," warrantless action may be justified).

The emergency aid exception and the exigent circumstances exception differ in at least one key way. The exigent circumstances exception "requires both probable cause and an exigency." *State v. Snow*, 337 Or 219, 223, 94 P3d 872 (2004). The emergency aid exception does not: It permits warrantless entry, search, or seizure, regardless of whether the officer has probable cause to believe that a crime has been or is being committed, as long as the officer reasonably believes it necessary to "render immediate aid to persons *** who have suffered, or who are imminently threatened with suffering, serious physical injury or harm." *Baker*, 350 Or at 649. Emergency aid requires only "an objectively reasonably belief, based on articulable facts" that such an emergency exists. *Id*.

The exceptions also may differ in scope. Although this court has not decided the question, it has, as noted, described exigent circumstances as including those in which swift action is necessary to prevent serious damage to "property." *Stevens*, 311 Or at 126. The emergency aid doctrine, on the other hand, has been described as applying to situations in which immediate action is necessary to render aid to "persons." *Baker*, 350 Or at 649.

In this case, the Court of Appeals held that the emergency aid exception extends to "animals that have suffered, or which are imminently threatened with suffering, serious physical injury or cruel death, unless that injury or death is being inflicted lawfully." *Fessenden*, 258 Or App at 649. The state does not disagree with that conclusion, but argues that both the emergency aid and the exigent circumstances exceptions apply here. In the state's view, both exceptions allow warrantless measures to prevent imminent threat to "property," and the state asserts that, even if a horse is not a "person," it is, at the very least, "property."

Defendants respond that exceptions to the warrant requirement must be "narrowly and carefully drawn," *see Davis*, 295 Or at 243 (observing that exceptions permitting intrusion into home must be "narrowly and carefully drawn"), and that neither exception now extends to or should be broadened to extend beyond the protection of human life to the protection of property. Inanimate property *qua* property does not constitute a compelling societal interest equivalent to the interest in avoiding serious physical harm to persons, defendants contend. Furthermore, they argue, even if animals are considered "sentient life" and not "property," society's interest in protecting animals from abuse and neglect is not sufficiently significant to invoke an exception to Article I, section 9.

Defendants explain society's interest in protecting animals as deriving not from a recognition that animal life is inherently worthy of protection, but from various benefits that humans receive by protecting animals. Historically, defendants assert, the common law did not protect animals aside from their status as the property of their owners. *See* Cass R. Sunstein, *Standing for Animals (with Notes on Animal Rights)*, 47 UCLA L Rev 1333, 1337 (2000) ("Courts generally suggested that such cruelty was not unlawful unless it worked an injury to the owner, who was the essential rights holder; but on rare occasions, the courts concluded that cruelty could count as a common law misdemeanor." (Footnotes omitted.)). Defendants contend that, when states later enacted anticruelty laws, their focus again was on the impact that animal cruelty could have on humans. *See* Thomas G. Kelch, *Toward A Non-Property*

*Status for Animals*, 6 NYU Envtl LJ 531, 540 (1998) ("[T]he focus and purpose of anti-cruelty laws is to prevent acts that may ultimately desensitize people to injuring humans. Thus, the focus is not on the welfare of animals, but on the impact that animal cruelty may have on actions concerning humans." (Footnotes omitted.)). *Cf. State v. Nix*, 355 Or 777, 791-92, 796-97, ___ P3d ___ (2014) (discussing development and purposes of anticruelty legislation).

Today, in Oregon, most of the laws prohibiting cruelty to animals are classified as misdemeanors, and many of those laws exempt specified activities and specified animals.[5] *See* ORS 167.315 to 167.332 (defining violations of animal welfare statutes as misdemeanors, with the exception of ORS 167.332, a Class C felony, and ORS 167.312, a Class C felony if damages to research facility amount to $2,500 or more); *see also* ORS 167.335 (exempting specified activities and specified animals from the protection of animal welfare statutes "[u]nless gross negligence can be shown"). Accordingly, defendants argue, even if society has an interest in protecting *certain* animals from *certain* kinds of mistreatment, that interest is not compelling and is impossible to translate into a "clear, workable, and consistent" warrant exception. *Cf. State v. Kock*, 302 Or 29, 33-34, 725 P2d 1285 (1986) (observing that "there are advantages in having a clear, workable, and consistent" exception to the warrant requirement).

Defendants have a point. Although Oregon's animal welfare statutes impose one of the nation's most protective statutory schemes,[6] defendants are correct that Oregon law still considers animals to be property. *See, e.g.*, ORS 167.310(2) (describing domestic animals as "owned or

---

[5] As noted, the legislature amended ORS chapter 167 in 2013. In doing so, the legislature added legislative findings and sentencing provisions and renumbered certain subsections. *See* Or Laws 2013, ch 719. We cite the current versions of the relevant statutes for a general understanding of animal welfare laws. We cite the 2009 version of the applicable statutes when discussing the crimes charged in this case.

[6] *See*, *e.g.*, Animal Legal Defense Fund, *2013 U.S. Animal Protection Laws Rankings*, http://www.aldf.org/wp-content/uploads/2013/12/2013-United-States-Animal-Protection-Laws-Rankings.pdf (last checked July 31, 2014) (ranking Oregon's animal welfare statutes among the most protective in the United States).

possessed by a person"); ORS 167.310(9) (describing minimum care that must be provided by an animal's "owner"); ORS 167.312 (providing for damages payable to an animal's "owner" for interference with research animals). Although the Oregon legislature has found that "[a]nimals are sentient beings capable of experiencing pain, stress and fear," ORS 167.305(1),[7] Oregon law nevertheless permits humans to treat animals in ways that humans may not treat other humans. With the exception of the execution of a judicially imposed sentence of death, *see* ORS 137.463 to 137.482 (setting out procedure for death penalty), it is never lawful to kill another human.[8] However, Oregon law explicitly sets out the methods by which animals may be killed. *See* ORS 603.010 - 603.995 (setting out procedures for animal slaughter).[9] Oregon statutes also allow animals to be treated or mistreated within the boundaries of "good animal husbandry" or "animal research." *See* ORS 167.310(6) (defining "good animal husbandry" as including "the dehorning of cattle, the docking of horses, sheep or swine, and the castration or neutering of livestock, according to accepted practices of veterinary medicine or animal husbandry"); ORS 167.312 (proscribing any interference with animal research).

The animal welfare statutes also distinguish between different kinds of animals. *See* ORS 167.310(3) - (8) (separately defining "animal," "domestic animal," "equine," "law enforcement animal," and "livestock"). Domestic animals,

---

[7] We recognize that ORS 167.305 was enacted after defendants' convictions; it therefore has no effect on defendants' legal position. We cite it only as evidence of the ongoing evolution of the legal status of animals.

[8] There are, of course, circumstances in which the killing of a human may be deemed justifiable, but not lawful. *See* ORS 161.219 (deadly physical force justified only to defend against a felony involving the use or threatened imminent use of physical force, use of unlawful deadly physical force, or burglary in a dwelling).

Oregon law also permits individuals, under certain limited circumstances, to obtain medication to end their own lives, but never the life of another human. *See generally* ORS 127.800 to 127.995 (setting out parameters and limitations for Death with Dignity Act); *see also* ORS 127.570 (forbidding mercy killing or assisted suicide).

[9] For instance, ORS 603.025 sets out licensing requirements for operators of slaughterhouses. ORS 603.045 to 603.059 set out minimum standards for slaughterhouses. ORS 603.065 states the methods of slaughter that are permissible in Oregon, requiring that animals be slaughtered only by licensees and by methods that render the animals "insensible to pain" or unconscious.

more colloquially known as pets, receive special consideration under Oregon law. ORS 167.310(4) defines "domestic animals" as "animal[s], other than livestock or equines, that [are] owned or possessed by a person." ORS 167.310(1), (2), and (9)(e) set out specific requirements for the food and shelter that must be provided to domestic animals, and ORS 167.343 sets out specific requirements and limitations for tethering domestic animals.[10]

As those statutes illustrate, some animals, such as pets, occupy a unique position in people's hearts and in the law. *See*, *e.g.*, *Rabideau v. City of Racine*, 243 Wis2d 486, 491, 627 NW 2d, 795, 798 (2001) ("[W]e are uncomfortable with the law's cold characterization of a dog *** as mere property.'"). Horses also hold a special place in human affection, as well as in the development of animal welfare laws. The seal of the American Society for the Prevention of Cruelty to Animals, the oldest animal protection organization in the United States, pictures an angel intervening to save a carriage horse from being beaten.[11] And the novel *Black Beauty* (1877), written from the point of view of a carriage horse, is widely credited with increasing awareness of the suffering of animals and advancing the cause of animal welfare. *See* Claudia Durst Johnson and Vernon Elso Johnson, *The Social Impact of the Novel: A Reference Guide* 253-54 (2002) (*Black Beauty* was "credited with boosting the activity in anticruelty societies and anticruelty legislation across the nation"). Ongoing litigation in the United States seeks to establish legal personhood for chimpanzees, *see* Charles Siebert, *The Rights of Man… and Beast*, *NY Times*, Apr 27, 2014, at MM28 (describing suits filed by the Nonhuman Rights Project on behalf of three chimpanzees), and India's Central Zoo Authority recently banned the exhibition of dolphins after concluding that their status was closer to that of "non-human persons."[12] As we continue to learn more about

---

[10] ORS 167.343, like ORS 167.305, was enacted in 2013; we cite it as general background.

[11] *See* ASPCA, *About Us*, http://www.aspca.org/about-us (last checked July 31, 2014) (showing seal).

[12] *See* Government of India, Ministry of Environment and Forestries, Central Zoo Authority, Circular, *Policy on Establishment of Dolphinarium - Regarding,* May 17, 2013, 2, http://envfor.nic.in/sites/default/files/ban%20on%20dolphanariums.pdf (last checked July 31, 2014) ("dolphin[s] should be seen as 'non-human persons'

the interrelated nature of all life, the day may come when humans perceive less separation between themselves and other living beings than the law now reflects. However, we do not need a mirror to the past or a telescope to the future to recognize that the legal status of animals has changed and is changing still, or to agree with defendants that, at this moment in time, Oregon law does not protect animal life to the same extent or in the same way that it protects human life.

From the premise that society's interest in protecting animal life is not now equivalent to its interest in protecting human life, defendant contends that an exception to the warrant requirement of Article I, section 9, that is justified by the latter should not extend to the former. The state disagrees, although not with the premise that animal and human life do not now occupy the same plane. Instead, the state argues that, when the Oregon Constitution, including Article I, section 9, was adopted, the state had authority to take warrantless measures to save and secure "property" and that then, as now, animals are characterized as "property." The state also argues that the "reasonableness" standard imposed by Article I, section 9, "should be construed in a manner consistent with relevant modern developments"— developments that demonstrate a modern societal interest in the protection of animals that permits the state to act on the animals' behalf in emergency circumstances. Accordingly, the state contends, both the emergency aid exception and the exigent circumstances exception should apply to permit warrantless intervention when an animal's life is at risk.

The parties' arguments thus call on this court to consider the past and current societal interests in protecting the lives of animals and the peoples' constitutional rights to possession and privacy and to decide in what instances and as to which animals, if any, society's interests are sufficiently compelling to justify a warrantless search or seizure. Those are difficult questions, and, as the United States Supreme Court has cautioned, "[t]heir difficulty admonishes us to observe the wise limitations on our function and to confine

_____

and as such should have their own specific rights and [it] is morally unacceptable to keep them captive for entertainment purpose[s]").

ourselves to deciding only what is necessary to the disposition of the immediate case." *Whitehouse v. Illinois Cent. R. Co.*, 349 US 366, 372-73, 75 S Ct 845, 99 L Ed 1155 (1955).

The fact that an exception to the Article, I, section 9, warrant requirement is at issue is an additional reason for caution. Since 1986, this court has been aware that, "in this modern day of electronics and computers," a day will come when the warrant requirement can be fulfilled expeditiously. *State v. Brown*, 301 Or 286, 278 n 6, 721 P2d 1357 (1986); *see also State v. Kurokawa-Lasciak*, 351 Or 179, 188, 263 P3d 336 (2011) (discussing desirability of "a neutral magistrate's evaluation of probable cause" and anticipating "advances in technology permit[ting] quick and efficient electronic issuance of warrants"). In many places and circumstances, obtaining a warrant no longer entails undue delay or prevents timely police action. *See Riley v. California*, ___ US ___, 134 S Ct ___, ___ L Ed ___ (June 25, 2014), WL 2864483 at *19 (discussing "[r]ecent technological advances" that have "made the process of obtaining a warrant itself more efficient"); *Missouri v. McNeely*, ___ US ___, 133 S Ct 1552, 1573, 185 L Ed 2d 696 (2013) (Roberts, C.J., concurring in part and dissenting in part) (describing jurisdiction where warrants may be obtained electronically in as little as 15 minutes). Given the perplexing questions presented and the current state of technology, we are hesitant to extend or broadly apply exceptions to the warrant requirement without firm constitutional basis.

We proceed, therefore, to the specific facts of this case and consider whether the officer's entry and seizure of the horse were permitted under an existing exception to the warrant requirement. We begin with the exigent circumstances exception because, as this court previously has articulated that exception, it permits warrantless action when necessary to prevent serious damage to "property." The parties acknowledge that, even if a horse is not a "person," it is "property." However, despite this court's broad articulation of the exigent circumstances exception, this court has not yet applied that exception to permit warrantless measures to protect property. Therefore, we pause to consider whether the exigent circumstances exception permits the particular warrantless acts at issue here.

One of the cases in which this court has applied the exigent circumstances exception is *Stevens*, a case in which officers had probable cause to believe that the defendant had kidnapped three children, that the children were with the defendant, and that the children were in imminent danger of serious harm. The court held that the officers' warrantless entry and search of the defendant's property to find the defendant and endeavor to rescue the children did not violate Article I, section 9. 311 Or at 130. In other cases, the court has applied the exigent circumstances exception in similar circumstances—when a crime is in progress and warrantless action is necessary to apprehend or detain a suspected perpetrator. *See Snow*, 337 Or at 225 (risk that defendant might escape created exigent circumstance justifying warrantless search); *State v. Roberts*, 249 Or 139, 143, 437 P2d 731 (1968) ("[I]t is preposterous to assert that a police officer in hot pursuit *** must stop as soon as the pursued drives upon private property *** and get a search warrant in order to apprehend the [suspect]."). The court also has applied the exigent circumstances exception when officers have seized the perpetrator and warrantless action is necessary to prevent the destruction of evidence. *See [State v. Machuca](#)*, 347 Or 644, 657, 227 P3d 729 (2010) (dissipation of alcohol from bloodstream of perpetrator presented exigent circumstance); *[State v. Meharry](#)*, 342 Or 173, 177, 149 P3d 1155 (2006) (court applied, as "a subset of the exigent circumstances exception, an 'automobile exception' to the warrant requirement" allowing warrantless search of mobile vehicle driven by perpetrator because evidence could be lost).

Those decisions demonstrate that the exigent circumstances exception to Article I, section 9, is not limited, as defendant argues, to circumstances in which human life is threatened. This court implicitly has recognized that officers are permitted to take warrantless measures in instances in which those measures are necessary to enable officers to fulfill essential law enforcement responsibilities in emergency circumstances. Therefore, the narrow question presented in this case is whether the responsibilities and circumstances extant in this case fell within that exception.

We conclude that they do. Our cases recognize that one of an investigating officer's most pressing responsibilities

is to apprehend the perpetrator of a crime in progress. An officer who has probable cause to believe that a perpetrator is in the process of causing unlawful harm has a responsibility to apprehend the perpetrator to prevent the perpetrator from causing further imminent harm to a victim. However, apprehending the perpetrator is not the only way that an officer may fulfill that responsibility. Here, based on observations made from a lawful vantage point, the officer had probable cause to believe that defendants were committing animal neglect under ORS 167.325 by failing to provide "minimal care" for the "victim" of that crime—the horse. *See Nix*, 355 Or at ___ (animals are "victims" for purposes of animal welfare statutes). The officer believed that, if the horse were to fall, she was at risk of serious imminent injury or death; he also believed that it would take at least four, and possibly as long as eight, hours to obtain a warrant to seize the horse and take her to a veterinarian. The officer's beliefs were objectively reasonable in light of the officer's training and experience as an animal welfare officer. *See, e.g.*, [*State v. Holdorf*](), 355 Or 812, ___ P3d ___ (2014).[13] Thus, the officer had probable cause to believe that a crime was in progress and, based on specific, articulable facts, determined that warrantless action was necessary to prevent an ongoing criminal act from causing further serious imminent harm to the victim of the crime—an animal entitled to statutory protection. In those circumstances, the exigent circumstances exception permitted the officer's actions.[14]

---

[13] Defendants argue generally that ORS 133.545 allows officers to apply for a warrant telephonically. Although that statutory option is a consideration in our analysis, *see Stevens*, 311 Or at 129-30, defendants did not impeach the officer's testimony by offering evidence that, if the officer had used that option, he could have obtained a warrant more quickly.

[14] Other state courts also have held that warrantless entries, searches, or seizures undertaken to protect animals are permissible when there is probable cause to believe that a crime is being committed and warrantless action is necessary to prevent the criminal act from causing further serious injury. *See, e.g.*, *People v. Chung*, 195 Cal App 4th 721, 732, 110 Cal Rptr 3d 253, 261 (2010) (exigent circumstances exception permitted warrantless entry where officer had probable cause to believe that the crime of animal cruelty was in progress); *State v. Stone*, 321 Mont 489, 498, 92 P3d 1178 (2004) (probable cause to believe that crime of animal cruelty was in progress and harm to animals was imminent permitted warrantless entry and seizure of starving rabbits); *Pine v. State*, 889 SW2d 625, 631 (Tex App 1994) (warrantless seizure permissible where "deputy had probable cause to believe the animal was being cruelly treated, and *** that

In arriving at that conclusion, we do not extend the exigent circumstances exception but apply it within narrow, workable confines. Our determination that the officer had probable cause to believe that a crime was in progress assures us that the officer acted in a circumstance in which the Oregon legislature intended to protect the horse. As noted, Oregon statutes criminalize the abuse or neglect of only certain animals and identify with particularity the care or treatment that is required or permitted. Accordingly, when an officer has probable cause to believe that a person is violating one of those statutes, the officer acts according to statutory standards and legislative policy, rather than the officer's own beliefs, in determining that a specific animal deserves and is in need of aid or protection. Judicial review of such actions is similarly circumscribed.

Our determination that the officer in this case acted based on specific, articulable facts enables us to ensure that the officer acted only as necessary to achieve his purpose. *Cf. State v. Watson*, 353 Or 768, 780-81, 305 P3d 94 (2013) (scope of a warrantless search "limited to its constitutionally permitted purpose and must be reasonably necessary to effectuate that purpose"); *Stevens*, 311 Or at 130 (scope of warrantless search limited to the exigency that justified it). And our determination that the officer acted only when he reasonably believed that the victim of the crime would suffer serious imminent harm if he refrained from acting until he could obtain a warrant assures us that a true emergency was presented. As the benefits of technological advances become more widespread, the time it takes to have a neutral magistrate consider whether there are constitutional grounds for a search or seizure may be reduced, and the opportunities for such review may be greater.

By describing the narrow confines of our conclusion in this case, we do not imply that the circumstances presented here are the only ones in which an officer may take warrantless measures to prevent serious harm to or the death of an animal. We simply exercise judicial restraint

---

obtaining a warrant was impracticable because the deputy reasonably believed there was an immediate need to act to preserve a life").

and leave for another day questions unnecessary to the resolution of this case, such as whether the emergency aid exception extends to animals.

We now turn to the warrant requirement of the Fourth Amendment to the United States Constitution. Like Article I, section 9, the Fourth Amendment provides that warrantless entries, searches, and seizures "are *per se* unreasonable \*\*\* subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 US 347, 357, 88 S Ct 507, 19 L Ed 2d 576 (1967). However, like Article I, section 9, the Fourth Amendment also allows for exceptions to the warrant requirement under exigent circumstances that are similar to those that this court deems sufficiently exigent under Article I, section 9. *See State v. Miskell/Sinibaldi*, 351 Or 680, 698, 277 P3d 522 (2012) (describing exigent circumstances under both Article I, section 9, and Fourth Amendment as "circumstances that require swift action to prevent harm to persons or property, escape of a suspect, destruction of evidence, or the like"). The Ninth Circuit describes exigent circumstances as those in which "a reasonable person would believe that [warrantless action] was necessary to prevent physical harm to the officers or other persons, the destruction of relevant evidence, the escape of the suspect, or some other consequence improperly frustrating legitimate law enforcement efforts." *United States v. Alaimalo*, 313 F3d 1188, 1192-93 (9th Cir 2002); *see also Hunsberger v. Wood*, 570 F3d 546, 555 (4th Cir 2009) (describing exigent circumstances as those creating "objectively reasonable belief that an emergency existed that required immediate entry to render assistance or prevent harm to persons or property within"); *Roska ex rel. Roska v. Peterson*, 328 F3d 1230, 1240 (10th Cir 2003) (describing exigent circumstances as those arising when "officers have reasonable grounds to believe that there is immediate need to protect their lives or others or their property or that of others").[15] At least one court has applied those federal

_____

[15] The United States Supreme Court has not explicitly described the exigent circumstances exception to the warrant requirement. That Court has, however, declared a variety of circumstances to be sufficiently exigent to permit warrantless action. *See*, *e.g.*, *Mincey v. Arizona*, 437 US 385, 392-94, 98 S Ct 2408, 57 L Ed 2d 290 (1978) (an officer may act without a warrant if, in an emergency

constitutional principles to uphold the warrantless seizure of an animal. *See Tuck v. United States*, 477 A2d 1115, 1119 (DC 1984) (where rabbit was dying of heat exposure in a pet store window, "procurement of [warrant] under the 'exigent circumstances' of this case would most likely have frustrated the effective fulfillment of [the public interest in animal welfare]"); *see also Siebert v. Severino*, 256 F3d 648, 657 (7th Cir 2001) (stating that "[e]xigent circumstances may justify a warrantless seizure of animals" but holding that no such exigency existed in case at hand).

Accordingly, having concluded that the officer's actions were permitted under the exigent circumstances exception to the warrant requirement imposed by Article I, section 9, of the Oregon Constitution, and understanding that the exigent circumstances exception to the warrant requirement of the Fourth Amendment to the United States Constitution similarly applied, we reach the same conclusion with regard to the Fourth Amendment as we reach with regard to the Oregon Constitution. The officer's warrantless seizure of the horse was lawful, and the trial court did not err in denying defendants' motions to suppress.

The decisions of the Court of Appeals and the judgments of the circuit court are affirmed.

---

presenting a "need to protect or preserve life or avoid serious injury, *** the exigencies of the situation make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment") (citations omitted); *Michigan v. Tyler*, 436 US 499, 509, 98 S Ct 1942, 56 L Ed 2d 486 (1978) (warrantless entry by firefighters permitted to prevent further potential harm to persons); *Warden v. Hayden*, 387 US 294, 298-99, 87 S Ct 1642, 18 L Ed 2d 782 (1967) (warrantless action permitted when officer is in hot pursuit of suspect); *Ker v. California*, 374 US 23, 40-41, 83 S Ct 1623, 10 L Ed 2d 726 (1963) (warrantless action permitted to prevent destruction of evidence). Federal courts have applied those cases in defining the exigent circumstances exception more generally. *See*, *e.g.*, *Hunsberger*, 570 F3d at 555 (defining exigent circumstances as "an emergency *** requir[ing] immediate entry to render assistance or prevent harm to persons or property within").