Argued and submitted July 23, affirmed September 9, 2021

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

MARLENE MANLING HSIEH,
*Defendant-Appellant.*

Multnomah County Circuit Court
19CR15168;
A171836 (Control), A172131, A172345

499 P3d 142

In this consolidated criminal appeal, defendant contests her conviction of first-degree animal neglect. Before trial, defendant moved to suppress evidence obtained as a result of a warrantless seizure of her cat. The trial court denied the motion upon determination that the exigent circumstances exception to the warrant requirement applied. On appeal, defendant argues that the record of the cat's injuries and pain did not support the exigent circumstances exception to the warrant requirement because mere pain is insufficient to support the exigency element of that exception. *Held*: Existing Oregon and federal exigent circumstances law requires that for application in animal welfare cases, the state must demonstrate that the animal was subject to further imminent harm to satisfy the exigency element. In this case, the record demonstrated that the cat suffered from more than mere pain, and that in the opinion of two veterinarians who examined the cat before the animal control officer seized the cat, the cat would suffer further harm without immediate action. The exigent circumstances exception to both the Oregon and federal constitutions applied in this case and the court did not err by denying defendant's motion to suppress.

Affirmed.

Amy M. Baggio, Judge.

Kyle Krohn, Deputy Public Defender, argued the cause for appellant. Also on the briefs was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Office of Public Defense Services. Marlene Manling Hsieh filed the supplemental brief *pro se*.

E. Nani Apo, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before James, Presiding Judge, and Ortega, Presiding Judge, and Kistler, Senior Judge.

JAMES, P. J.

Affirmed.

**JAMES, P. J.**

These consolidated criminal appeals concern defendant's conviction of first-degree animal neglect, ORS 167.330. In five total assignments, defendant claims error relating to (1) the trial court's denial of her motion to suppress evidence obtained after the allegedly unconstitutional seizure of her cat; (2) the sufficiency of the evidence to support a conviction for animal neglect; (3) the court's failure to dismiss based on a greater than 30-day delay in filing charges; (4) its imposition of $10,507.18 in restitution arising from veterinary treatment of Muzi, the cat that was seized; and (5) the trial court's finding of a violation of a probation term requiring defendant to rehome other cats present at her residence. We reject without discussion defendant's assignments related to insufficient evidence and unreasonable delay in filing charges. Defendant's assignment related to restitution is foreclosed by ORS 167.350 and *State v. Silver*, 304 Or App 444, 467 P3d 67, *rev den*, 367 Or 387 (2020).[1] We note that defendant specifically agreed, at sentencing, to rehome the three other cats, and reject that unpreserved assignment without further discussion. The sole remaining assignment of error, and the focus of our discussion, concerns the motion to suppress. Because we conclude that the trial court did not err in denying defendant's motion to suppress, we affirm.

We review a trial court's denial of a motion to suppress for legal error but defer to the trial court's findings of fact if there is any constitutionally sufficient evidence in the record to support those findings. *State v. Brownlee*, 302 Or App 594, 596, 461 P3d 1015 (2020). If the trial court did not make factual findings for each pertinent issue, and there is evidence in the record that supports divergent factual findings, we will presume the trial court decided facts consistently with the ultimate conclusion. *Id.* Because defendant in this case assigns error to the denial of the pretrial motion to suppress, we evaluate that argument in light of the record made before the trial court when it denied the motion, not the trial record as it later developed. *State v. Pitt*, 352 Or

---

[1] At sentencing, the trial court left the restitution issue open for 90 days and provided opportunity to request a hearing on the amount of restitution.

566, 574-75, 293 P3d 1002 (2012). We state the facts consistently with that standard.

In January 2019, Multnomah County Animal Service control officer Holden received a complaint from a veterinarian at the Banfield Pet Hospital. The complaint arose from an examination that two veterinarians, Gravens and Toleno, performed on defendant's cat, Muzi, earlier that day.[2] As part of the conversation, Toleno sent Holden veterinary records and photographs taken during the examination. Those photographs are part of the record on appeal and have been reviewed. Upon even casual inspection they are startling and show a severely injured cat.

Toleno characterized the injuries she observed to Holden. She said that "the injuries were extremely painful and that the—the cat was in desperate need of immediate medical treatment." Toleno said the first thing she noticed about Muzi was that

> "[t]he cat was clearly burnt, the whole left side of her face, and then she was missing digits on her back right foot and I think her—her front foot as well, so she was missing her toes and they were super ulcerated and there was exposed bone."

Toleno said the "super ulcerated [skin] with bone exposure" meant that whatever was going on with Muzi "had to be going on at least a couple of weeks." Gravens said Muzi seemed to be a "happy cat" but added that "[c]ats are just very good at not showing us pain * * * they're not as vocal as some of our other creatures," and that a cat's current behavior was not entirely indicative of how long an injury had existed.

Defendant told Gravens that she had been treating Muzi with "medicated shampoos, mostly fungal." Gravens said that in her experience, the "fungal diseases in this area * * * usually don't cause that much tissue loss. We shouldn't have lost toes like that." Gravens suggested to defendant that the "best medicine" was to "sedate, clean

---

[2] Holden said the veterinary records sent to him logged the veterinary appointment at 9:52 a.m. Holden stated that he arrived at defendant's home at 4:01 p.m. on the same day.

up everything, get some biopsies, try to figure out what's going on." Defendant did not want to go forward with biopsy and therapy but did eventually agree to give Muzi antibiotics and pain medication. Gravens did not consider the pain medication to be therapeutic, rather it was "buying time for the cat to have a good quality of life while we get appropriate therapy." Gravens was positive that Muzi was suffering and needed immediate care. Muzi's injuries were severe enough that Toleno and Gravens ultimately called animal control—the first time in Graven's 10-year career that she had made such a call.

After Holden spoke with Toleno and reviewed the photographs, he drove to defendant's home. After Holden informed defendant of the complaint and asked to see Muzi, defendant invited Holden inside. Once inside, Holden observed that

> "[t]he cat appeared pretty lethargic still, even though it was on some sort of pain medication. It—it did seem pretty lethargic and it just—it looked like it was suffering to me. It seemed pretty painful. I mean, it had a lot of—you know, what I would suspect to be burns over its body and I saw exposed bone and it just—it didn't look like it was doing very well, and based off what I was seeing and what the vets told me, it seems like a pretty serious condition that needed treatment."

Holden said that in his "six years (in animal control), I haven't seen something like that before. So I was—I was actually pretty shocked." At that point, Holden "decided that the cat needed medical treatment and *** didn't feel that it was safe remaining in the home any longer." Holden said that when he told defendant that Muzi needed immediate care, defendant said, "Why would I spend more money on treatment, when I can use the money to buy more cats?"

After removing Muzi from defendant's home, Holden took the cat straight to the treatment room at Dove Lewis Emergency Hospital. Holden said that he would have removed the cat even if defendant had "an appointment for the following day or the day after that, to seek a second opinion and *** treat the cat at a veterinarian practice." Based on the serious condition of the cat, requiring immediate

treatment, Holden did not believe he had time to obtain a warrant.

Before trial, defendant moved to suppress "all property seized by the animal control officer, all observations made by the animal control officer, and all statements made by [defendant]" as a result of a warrantless seizure of Muzi. After a pretrial hearing on the motion to suppress, the court denied the motion, concluding that,

> "at the time of the officer's seizure of the cat, the officer had probable cause to believe that the cat was subjected to animal neglect in the first and/or second degree.
>
> "And second, that the officer reasonably believed an exigent circumstance that of the imminent harm to the animal, and testified to by all the witnesses this morning, required a warrantless seizure.
>
> "The court therefore notes that if this court is wrong, as a matter of law, and that the emergency aid exception to the warrant requirement applies to animals, then these are the same findings of exigency that will also support an emergency aid exception to the warrantless seizure of the cat. And for those reasons, the defense motion to suppress is denied."

The trial court had earlier determined that the question about whether the emergency aid exception applied to animals was "unclear" but the answer to that question was not dispositive because of the court's finding on the exigent circumstances exception to the warrant requirement.

Defendant waived jury trial and the trial court found her guilty of one count each of first- and second-degree animal neglect. The court merged the verdicts on those counts and imposed 12 months' probation and $10,507.18 in restitution. The court later found that defendant violated the conditions of her probation for failing to "rehome or surrender [other] cats as required per judgment."

On appeal, defendant argues that the exigent circumstances exception did not justify the seizure of Muzi because the record does not show the cat faced an "imminent risk of serious harm" or how long it would have taken the officer to obtain a warrant. Additionally, she argues that the

emergency aid exception did not justify the seizure because that exception requires a "risk of serious injury or death and not mere pain," especially when defendant was taking some steps to treat the pain. In either case, defendant argues the seizure violated her rights under both Article I, section 9, of the Oregon Constitution and the Fourth Amendment to the United States Constitution.

In arguing that the exigent circumstances exception did not apply in this case, defendant claims Holden's concerns were "primarily, if not exclusively, that Muzi was in pain, which did not constitute an exigent circumstance." Mere pain, as defendant sees it, falls far short of the "further serious imminent harm" to the animal that is required under Oregon law for the exigent circumstances exception to apply.

Likewise, according to defendant's arguments before us, because Muzi was merely "in pain" and not at "risk of serious injury or death" the emergency aid exception did not justify the warrantless seizure. According to defendant, even for human victims, as a matter of law, mere pain is insufficient to support the emergency aid exception. Moreover, because one of the veterinarians thought Muzi was a "happy cat," the record was insufficient to support a finding that Holden even knew Muzi was in pain. Defendant argues that the facts of this case simply do not present the "depraved abandonment of a starving animal" present in previous Oregon cases addressing the emergency aid exception as applied to animals.

The state argues that we should affirm the trial court because the warrantless seizure was justified by both the exigent circumstances and the emergency aid exceptions. Specifically, the exigent circumstances exception justified the seizure because the officer had probable cause that a crime had occurred, so this case presented a "situation that require[d] the police to act swiftly to prevent danger to life or serious damage to property." Although animals are property for purposes of the exception analysis, the state argues that since the existing case law applies a "serious imminent injury or death" standard, the trial court did not err by applying that standard. Finally, the state argues that

the lack of evidence about how long it would have taken to obtain a warrant did not prevent the trial court from determining it was reasonable for Holden to seize Muzi. According to the state, this case "presents a unique circumstance in which Officer Holden reasonably believed that waiting for any period of time would necessarily subject Muzi to further pain and suffering at the hands of defendant," and that it was not important that he did not testify as to how long it would have taken to get a warrant.

With respect to the emergency aid exception, the state argues that the exception does apply to animals. The existing cases, the state contends, have allowed the emergency aid exception in circumstances where immediate steps were needed to save animals from potential death or "to alleviate their suffering." That, the state says, is the same basis that justified Holden's warrantless seizure of Muzi—his reasonable belief that he should take immediate steps to alleviate her suffering from ongoing severe injuries.

With the parties' arguments in mind, we turn to the merits. Article I, section 9, of the Oregon Constitution provides in relevant part: "No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure." Searches occur when a state actor invades a protected privacy interest, while seizures of property occur when a state actor "significant[ly] interfere[s] with a person's possessory or ownership interests in property." *State v. Newcomb*, 359 Or 756, 764, 375 P3d 434 (2016). Defendant does not challenge Holden's entry into the home, so we need not analyze whether protected privacy interests are involved. Regardless of whether a state action constituted a search or a seizure, such action without a warrant is categorically unreasonable, unless one of the "specifically established and well-delineated exceptions" to the warrant requirement applies. *State v. Fessenden/ Dicke*, 355 Or 759, 764, 333 P3d 278 (2014).

The first applicable exception, as found by the trial court, involves exigent circumstances. A state actor may enter and search a premises and seize property when the actor has both probable cause that a crime has occurred and the situation "requires the police to act swiftly to prevent

danger to life or serious damage to property, or to forestall a suspect's escape or the destruction of evidence." *Id*. at 765 (quoting *State v. Stevens*, 311 Or 119, 126, 806 P2d 92 (1991)). In this case, defendant does not challenge the probable cause element, so we confine our analysis to the exigency only; however, as will be explained, the probable cause element bears heavily on the exigency element.

The Supreme Court's explanation of the circumstances, policy, and limits of the exigent circumstances exception in the context of animal neglect provides ample guidance to resolve this case. In *Fessenden*, an officer with animal husbandry training was dispatched to investigate reports of a starving horse. *Id*. at 761. From a lawful vantage point, the officer observed that the

> "horse's backbone protruded, her withers stood up, her neck was thin, all of her ribs were visible, she had no visible fatty tissue in her shoulders, and she was 'swaying a little bit,' all of which the officer recognized as signs of emaciation. The horse also was straining to urinate, which the officer recognized as a sign of kidney failure (a potential result of starvation)."

*Id*. The officer explained that the horse was "literally \*\*\* the thinnest horse I've seen that was still on its feet," and that he was afraid the horse would fall and not be able to get back up, adding that when emaciated horses fall, they frequently have to be euthanized. *Id*. at 761-62 (omission in original). The officer believed the owners of the horse were committing first-degree animal neglect. The officer also believed it would take between four and eight hours to obtain a warrant, and that during that time the horse might fall, resulting in its death. *Id*. at 762. The officer therefore entered the property, seized the horse, and took it to a veterinarian, who determined the horse was starving and needed immediate medical treatment. *Id*.

On appeal, the Supreme Court noted that "[a]lthough Oregon's animal welfare statutes impose one of the nation's most protective statutory schemes, \*\*\* Oregon law still considers animals to be property." *Id*. at 767. Even so, those statutes also impose duties on persons in custody of animals. *Id*. at 767-69 (discussing statutory duties and animating

principles). While some animals, such as pets and horses, "occupy a unique position in people's hearts and in the law," and while it may be in the future that "humans perceive less separation between themselves and other living beings than the law now reflects," "Oregon law does not protect animal life to the same extent or in the same way that it protects human life." *Id*. at 769-70. Even considering that the law does not yet elevate animal life to the same level as human life, the court determined that the existing conceptions of the exigent circumstances exception sanctioned the officer's warrantless entry and seizure of the emaciated horse. *Id*. at 772-73.

On the other side of this calculus are the privacy and property interests giving life to the protection against warrantless searches and seizures. *Id*. at 770-71. But those interests must yield, in certain circumstances, to society's interest in protecting human life from imminent danger of serious harm; to apprehending or detaining a suspected perpetrator of a crime in progress; and to preventing loss or destruction of evidence. *Id* at 772. The distillation of those principles, the court concluded, is that an "officer who has probable cause to believe that a perpetrator is in the process of causing unlawful harm has a responsibility to apprehend the perpetrator to prevent the perpetrator from causing further imminent harm to a victim."[3] *Id*. at 773. The limits on the exigent circumstances exception, as applied to animal welfare cases, require that the probable cause be moored in one of the animal protection statutes, and that the officer's determination of exigency be rooted in "statutory standards and legislative policy, rather than the officer's own beliefs, in determining that a specific animal deserves and is in need of aid or protection." *Id*. at 774. Put differently, the exigency must be determined by reference to the "particularity of care or treatment that is required" in the statutes criminalizing abuse or neglect of certain animals, not by the officer's own conception of right and wrong. *Id*. Thus, an exigency exists when a person fails to provide the "minimum care" required by statute, ORS 167.310(9), and the failure results

---

[3] The court added that apprehension of the perpetrator is not the only constitutionally permissible way to fulfill that responsibility. *Id*. at 773. State seizure of the victim may be justified as to prevent unlawful harm.

in imminent "physical injury," ORS 167.310(10), or imminent "serious physical injury," ORS 167.310(13). Further, the officer's beliefs must be grounded in specific and articulable facts, in contrast to a gut feeling, that justify the warrantless action. *Fessenden*, 355 Or at 774.

        The import of the requirement to refer to the animal welfare statutes when making a determination of exigency is clear—the state's interest in protecting an animal and bringing an alleged perpetrator to justice must yield to the constitutional protections against search and seizure, and the attendant warrant process, unless the condition of the animal represents a gross deviation from the norm. In prescribing the standard of care a person owes to an animal in their possession, the legislature did not require the utmost care or the best medicine available, rather the legislature required only reasonable care. *See, e.g.*, ORS 167.310(9)(d) (veterinary care required only to extent deemed necessary by reasonably prudent person). Oregon cases confirm that an exigency exists when the animal's condition is a result of a gross deviation from the required standard of care, and add that there must be a reasonable temporal nexus between the observed condition of the animal and the feared harm.[4] *See, e.g.*, *Newcomb*, 359 Or at 759 (lawful seizure when dog was apparently starving, near-emaciated, dry-heaving, and "eating at random things in the yard"); *Fessenden*, 355 Or at 761 (officer observed starving horse that he believed may fall and require euthanasia); *State v. Hershey*, 286 Or App 824, 827-28, 401 P3d 256, *rev den*, 362 Or 281 (2017) (exigency existed when cattle were observed to be "thin, * * * starving, no food, and that they were trying to get out of the property to obtain food and/or water").

        With these principles in mind, we turn to the instant case. With respect to the circumstances underlying the officer's actions, we find them to be sufficiently similar to the overall circumstances in *Fessenden* to warrant application of the exigent circumstances exception. In *Fessenden*,

---

[4] While not presently before us, there may be situations where an animal is subjected to an unlawful standard of care that does not present a near-term danger of the outcomes prohibited by the animal welfare laws. In that scenario, it may be doubtful that a sufficient exigency would exist to justify a warrantless state action.

the officer encountered a situation where the victim—the emaciated horse—was in dire shape, "literally \*\*\* the thinnest horse I've seen that was still on its feet." *Id.* at 761. Here, despite defendant's efforts to recast Muzi's condition as "mere pain," the record tells a far different story, one that "shocked" Holden—a six-year veteran of animal control who had never seen something like Muzi's condition before, despite "multiple calls per year for cat neglect." Muzi's condition was sufficiently dire for Gravens to call animal control services for the first time in her 10 years as a veterinarian; however, Toleno, the other examining veterinarian beat her to it. And, as the photos present in the appellate record bear witness, Muzi's injuries were severe and shocking, with exposed bone that dispels any claims of "mere pain." After putting aside the "mere pain" framing, we are left with a cat that was suffering from some unknown ailments which required, in the estimation of two separate veterinarians, "immediate treatment." And unlike *Fessenden*, where the animal control officer's concerns about the condition of the animal were confirmed by a post-seizure veterinary examination, in this case a pre-seizure examination determined the animal's condition and need for immediate treatment. Guided by his communication with the veterinarians and his own observations, it was not unreasonable for Holden to conclude Muzi needed to be removed from defendant's home for immediate treatment.

Moreover, Holden's assessment of Muzi's condition, and by extension the determination of exigency, was guided by the "statutory standards and legislative policy" animating the animal welfare laws. Holden testified that he observed what he suspected to be burns over Muzi's body, exposed bone, and a cat that was suffering from an "extremely painful" condition. For the purposes of exigent circumstances in this case, Holden's observations fit within the conditions the legislature sought to protect animals against by adopting the animal welfare statutes. *See* ORS 167.310(10) ("'Physical injury' means physical trauma, impairment of physical condition or substantial pain."); ORS 167.310(11) ("'Physical trauma' means fractures, cuts, punctures, bruises, burns or other wounds."); ORS 167.310(13) ("'Substantial physical injury' means physical injury that creates a substantial

risk of death or that causes protracted disfigurement, protracted impairment of health or protracted loss or impairment of the function of a limb or bodily organ."). And based on his own observations, training, and communication with the veterinarians, Holden reasonably believed that Muzi was presently experiencing prohibited conditions, not that Muzi was in danger of experiencing those conditions at some indeterminate future time. Thus, in this case, the required temporal connection between the prohibited condition and feared harm was present.

Here, like in *Fessenden*, the officer had probable cause to believe defendant was committing criminal animal neglect by failing to provide the "minimum care" required by law. Like in *Fessenden*, the officer believed that absent immediate action, the animal would continue to suffer from conditions proscribed by statute. And like in *Fessenden*, the officer testified that in light of the circumstances, there was not time to go through the warrant process before seizing the animal.[5]

Thus, like in *Fessenden*, the officer in this case had probable cause that a crime was in progress, and based on specific, articulable facts about the animal's condition, determined that warrantless action was needed to prevent the ongoing criminal act from further injuring the victim of the crime. The exigent circumstances exception permitted the officer's actions and the trial court did not err by so concluding.

Like Article I, section 9, the Fourth Amendment to the United States Constitution deems warrantless entries, searches, and seizures "*per se* unreasonable * * * subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 US 347, 357, 88 S Ct 507,

___

[5] In *Fessenden*, the officer believed it would take four to eight hours to obtain a warrant to seize the horse. In this case, the officer said he did not believe there was time to obtain a warrant because the cat needed immediate treatment. While the time required to obtain a warrant—to be sure the constitutionally preferable option—is a consideration in our analysis of exigent circumstances, defendant did not rebut or impeach Holden's testimony that there was not time to obtain a warrant. *See Fessenden*, 355 Or at 773 n 13. Further, the visible injuries on Muzi, coupled with the information from both veterinarians, supports Holden's assessment that the animal was seriously injured and required treatment without delay.

19 L Ed 2d 576 (1967). Federal law, like Oregon law, recognizes the exigent circumstances exception to the warrant requirement. Federal exigencies largely track Oregon exigencies, for example, an officer may enter a home to render emergency assistance to an injured occupant, protect that person from imminent injury or ensure safety; similarly an officer may make warrantless entry to prevent imminent destruction of evidence or prevent a suspect's escape. *Lange v. California*, ___ US ___, ___, 141 S Ct 2011, 2018, 210 L Ed 2d 486 (2021). The focus of the federal inquiry is on whether "the delay required to obtain a warrant would bring about some real immediate and serious consequences" as to excuse the absence of a warrant. *Id.* (internal quotation marks omitted).

As the Oregon Supreme Court explained in *Fessenden*, federal exigent circumstances exceptions are applied in much the same manner as those of state law, including those addressing seizure of animals. *Fessenden*, 355 Or at 775-76. Accordingly, since we have concluded that the officer's warrantless actions were permitted under the Oregon Constitution, it follows that those actions do not offend the United States Constitution. Because the seizure was permissible under both constitutions, the trial court did not err by denying defendant's motion to suppress.

As we have determined that the exigent circumstances exception permitted the officer's warrantless seizure of the cat, we do not reach the question of whether the emergency aid exception also permitted the seizure.

Affirmed.