No. 50          August 7, 2014          777

IN THE SUPREME COURT OF THE
STATE OF OREGON

STATE OF OREGON,
*Petitioner on Review,*

*v.*

ARNOLD WELDON NIX,
*Respondent on Review.*

(CC CRH090155; CA A145386; SC S060875)

On review from the Court of Appeals.*

Argued and submitted September 17, 2013.

David J. Celuch, argued the cause and filed the brief for petitioner on review.

Jamie K. Contreras, Assistant Attorney General, argued the cause and filed the brief for respondent on review.

Before Balmer, Chief Justice, and Kistler, Walters, Linder, Landau, and Baldwin, Justices.**

LANDAU, J.

The decision of the Court of Appeals is affirmed. The judgment of the circuit court is reversed, and the case is remanded for entry of separate convictions on each guilty verdict for a violation of ORS 167.325 and for resentencing.

_____
   * Appeal from Umatilla County Circuit Court, Jeffrey M. Wallace, Judge. 251 Or App 449, 283 P3d 442 (2012).

   ** Brewer, J., did not participate in the consideration or decision of this case.

**LANDAU, J.**

In this criminal case, defendant was found guilty of 20 counts of second-degree animal neglect. ORS 167.325 (2009).[1] Oregon's "anti-merger" statute, ORS 161.067, provides that, when the same conduct or criminal episode violates only one statute, but involves more than one "victim," there are "as many separately punishable offenses as there are victims." The issue in this case is whether defendant is guilty of 20 separately punishable offenses, which turns on the question whether animals are "victims" for the purposes of the anti-merger statute. The trial court concluded that, because only people can be victims within the meaning of that statute, defendant had committed only one punishable offense. The court merged the 20 counts into a single conviction for second-degree animal neglect. On appeal, the Court of Appeals concluded that animals can be victims within the meaning of the anti-merger statute and, accordingly, reversed and remanded for entry of a judgment of conviction on each of the 20 counts and for resentencing. *State Nix*, 251 Or App 449, 283 P3d 442 (2012). We agree with the Court of Appeals and affirm.

The undisputed facts are aptly summarized by the Court of Appeals:

"Acting on a tip, police officers entered defendant's farm and found dozens of emaciated animals, mostly horses and goats, and several animal carcasses in various states of decay. Defendant owned those animals. Defendant was indicted on 23 counts of first-degree animal neglect, ORS 167.330, and 70 counts of second-degree animal neglect, ORS 167.325. Each separate count identified a different animal and charged conduct by defendant toward that animal. All of the separate counts were alleged to have

---

[1] ORS 167.325 was amended in 2013. Or Laws 2013, ch 719. The new law includes findings that "[a]nimals are sentient beings capable of experiencing pain, stress and fear" and that "[a]nimals should be cared for in ways that minimize pain, stress, fear and suffering." *Id.* § 1. It also increases the penalty for second-degree animal neglect if, among other things, "the offense was part of a criminal episode involving 11 or more animals." *Id.* § 4(3)(b). The amendments do not apply to this case, and we refer to the 2009 version of the law—the law that applied when defendant committed the offenses—throughout this opinion. We also express no opinion about the effect of the 2013 amendments on the issue presented in this case.

occurred within the same span of time. A jury convicted defendant of 20 counts of second-degree animal [neglect].

"At defendant's sentencing hearing, the state asked the trial court to impose 20 separate convictions because the jury had found defendant guilty of neglecting 20 different animals. Accordingly, the state argued, the convictions 'do not merge based on [ORS 161.067](1), (2) and (3).' The trial court disagreed and merged the guilty verdicts into a single conviction, explaining that

"'[ORS 161.067(2)] talks about—although violating only one statutory provision, it involves two or more victims. In this case, I agree with the defendant's position that the animals are not victims, as defined by the statute; by the ORS 161.067(2).

"'*** I don't think that [ORS 161.067(3) ] applies because the animals are not victims under the definition of the statute requiring that to be persons.'

"Defendant was sentenced to 90 days in jail and three years of bench probation; the trial court suspended imposition of the jail sentence, and the state appealed."

*Nix*, 251 Or App at 451-52.

The state appealed, assigning error to the trial court's merger of the 20 counts of second-degree animal neglect. The state argued that, under *State Glaspey*, 337 Or 558, 563, 100 P3d 730 (2004), the term "victim" in the anti-merger statute draws its meaning from the underlying substantive criminal statute that defendant violated. In this case, the state argued, the text, context, and legislative history of the second-degree animal neglect statute make clear that the legislature intended the neglected animals as the victims of the offense.

Defendant argued that the ordinary meaning of the term "victim" does not include non-humans. Animals, he argued, are treated by Oregon law as the property of their owners. In defendant's view, because no statute expressly defines the word to include animals, only persons can be victims under the anti-merger statute.

The Court of Appeals reversed. In brief, the court reasoned that, following this court's instruction in *Glaspey*,

the meaning of the term "victim" as it is used in the anti-merger statute is determined by reference to the underlying substantive criminal statute that defendant violated. 251 Or App at 457-58. The court explained that the substantive criminal statute at issue in this case, ORS 167.325, evinces a legislative concern with the well-being of animals. Reviewing the text and history of the statute, the court concluded that, although animals are usually considered the property of persons, ORS 167.325 reflects a broader public interest in "protect[ing] individual animals as sentient beings" by ensuring that such animals receive minimum care and are not abused or neglected. *Id.* at 460-61.

On review before this court, defendant renews his argument that "the ordinary meaning of the word 'victim' means a 'person,'" not an animal. According to defendant, "[a]nimals are defined as property under Oregon law," and "[t]here is no statute that allows property to be seen as a victim" of a criminal offense. In defendant's view, the victim of an animal neglect case is either the public at large or the owner of the animal.

The state responds that the ordinary meaning of the word "victim" is not as narrow as defendant contends and that, to the contrary, it commonly is used to refer both to animals and to human beings. Moreover, because individual animals directly suffer the harm that is central to the crime of animal neglect, as set out in ORS 167.325, they are the "victims" of that crime. According to the state, the text and history of the statute make clear that the legislature was concerned with the capacity of animals to suffer abuse and neglect. Indeed, the state argues, the legislature expressly structured the animal neglect statutes "such that the degree of the crime corresponds to the extent of the animal's suffering." Thus, in the state's view, the statutes evince a concern to protect more than a general public interest in animal welfare; rather, those statutes reflect the legislature's intention to protect individual animals from suffering.

The issue before us is one of statutory construction, which we resolve by applying the familiar principles set out in *PGE Bureau of Labor and Industries*, 317 Or 606, 610-12, 859 P2d 1143 (1993), and *State Gaines,* 346 Or 160, 171–73,

206 P3d 1042 (2009). Our goal is to ascertain the meaning of the statute that the legislature most likely intended. *Halperin Pitts*, 352 Or 482, 486, 287 P3d 1069 (2012).

We begin with the text of the statute, in context. Oregon's anti-merger statute provides that, when a defendant is found guilty of committing multiple crimes during a single criminal episode, those guilty verdicts "merge" into a single conviction, unless they are subject to one of a series of exceptions. One of those exceptions is ORS 161.067(2), which provides that, "[w]hen the same conduct or criminal episode, though violating only one statutory provision[,] involves two or more victims, there are as many separately punishable offenses as there are victims." At issue in this case is the meaning of the word "victims" as it is used in that statute.

In the absence of evidence to the contrary, we assume that the legislature intended that the wording of an enactment to be given its ordinary meaning. *State Murray*, 340 Or 599, 604, 136 P3d 10 (2006). The ordinary meaning of the word "victim" reflected in a dictionary of common usage is:

> "**1 :** a living being sacrificed to some deity or in the performance of a religious rite **2 :** someone put to death, tortured, or mulcted by another : a person subjected to oppression, deprivation, or suffering <a ~ of war> <a ~ of intolerance> <fell a ~ to prohibition era gangsters> **3 :** someone who suffers death, loss, or injury in an undertaking of his own <became a ~ of his own ambition> **4 :** someone tricked, duped, or subjected to hardship **:** someone badly used or taken advantage of <felt himself the ~ of his brother's shrewdness—W.F. Davis> <little boys, as well as adolescent girls, became the willing ~s of sailors and marines—R.M. Lovett>

> "**syn** PREY, QUARRY: VICTIM applies to anyone who suffers either as a result of ruthless design or incidentally or accidentally <the victim sacrificed on these occasions is a hen, or several hens—J.G. Frazer> <was the girl born to be a victim; to be always disliked and crushed as if she were too fine for this world—Joseph Conrad> <lest such a policy precipitate a hot war of which western Europe would be the victim—Quincy Wright> ***."

*Webster's Third New Int'l Dictionary* 2550 (unabridged ed 1983).[2]

In that light, it can be seen that defendant's contention that the "plain meaning" of the word "victim" refers only to persons, and not to animals, is predicated on a selective reading of the dictionary definitions. The first sense listed in the definition, for example, refers broadly to "a living being," not solely to human beings. And the synonymy gives as an example of the word "victim" the sacrifice of animals. The ordinary meaning of the word "victim," then, is capable of referring either to human beings, animals, or both.[3]

Illustrative examples of the plain meaning of "victim" to refer to animals are not difficult to locate. Especially in the context of animal cruelty, it is common to refer to animals as "victims." As far back as the mid-nineteenth century, John Stuart Mill referred to the "unfortunate slaves and victims of the most brutal part of mankind; the lower animals." John Stuart Mill, 2 *Principles of Political*

---

[2] Other dictionaries offer similar definitions. The *Oxford* dictionary, for example, defines "victim" as, among other things, "[a] living creature killed and offered as a sacrifice" and "[o]ne who is reduced or destined to suffer under some oppressive or destructive agency" and includes as an example of the latter sense a literary quotation that refers to an animal as a victim: "We . . . even went to the length of fixing upon one useless, toothless old fellow [*sc* a dog] as a victim to our appetites, in case of extremity." XIX *Oxford English Dictionary* 607 (2d ed 1989) (alternation in original; internal quotation marks and citation omitted). *See also The American Heritage Dictionary* 1990 (3d ed 1992) ("One who is harmed or killed by another *** A living creature slain and offered as a sacrifice"). The definition of "one," it should be noted, is not limited to human beings. *See, e.g.*, *Webster's* at 1575 ("a single unit or entire being or thing"); X *Oxford* at 805 ("[a] person or being whose identity is left undefined").

[3] The idea of animals being regarded as "victims" is not a new one. *Animals as Offenders and Victims*, 21 Alb LJ 265, 266 (1880) (recounting the history of animal welfare laws in Europe and noting that eventually legislation prohibited cruelty to animals "not out of regard to the owner, but in mercy to the creature itself"). In a related vein, there are records of legal proceedings being brought against animals as named parties to legal proceedings as early as the Middle Ages in Europe and as recently as the twentieth century in this country, which reflect that animals often have been treated, as least for some purposes, as persons. *See generally* Jen Girgen, *The Historical and Contemporary Prosecution and Punishment of Animals*, 9 Animal L 97 (2003) (recounting criminal prosecutions of pigs, cows, bulls, horses, mules, oxen, goats, sheep, and dogs, among others, dating at least from the thirteenth century); *see also* Edward P. Evans, *The Criminal Prosecution and Capital Punishment of Animals* (1987); Paul Schiff Berman, *Rats, Pigs, and Statues on Trial: The Creation of Cultural Narratives in the Prosecution of Animals and Inanimate Objects*, 69 NYU L Rev 288 (1994).

*Economy: With Some of Their Applications to Social Philosophy* 579 (1864). Rachel Carson complained of cruelty to all, "whether its victim is human or animal." Letter from Rachel Carson to Oxford University Press, (undated) (on file with Yale University Library). A headline from an early New York Times article referred to "Animal Victims of Railroad Trains." N Y Times, Oct 11, 1914, at 77. A more recent article from 1982 on a series of hunting photographs from India mentioned pictures of "animal victims." *Images of India*, N Y Times, April 25, 1982. A 1992 article from the Chicago Tribune similarly is headlined, "Pair Heading to Bosnia to Aid Animal Victims of War." Chi Trib, Oct 6, 1992. Closer to home, an article in the Oregon State Bar Bulletin reported that, "[t]he Oregon Legislature has repeatedly and consistently articulated a strong public policy favoring the aggressive prosecution of animal cruelty cases by enacting statutes requiring police officers to make arrests in cases of animal abuse and to pay for and provide care to victim animals." *Full-Time Prosecutor to Litigate Animal Cruelty Cases Statewide*, Or State Bar Bulletin, May 2013.

Having established the common, ordinary meaning of the term "victim," the question is whether anything in the statute at issue suggests that the legislature meant something different. Certainly nothing in the wording of ORS 161.067(2) suggests that the word "victim" cannot refer to animals. If anything, the phrasing of the statute—which refers to the violation of another statutory provision—suggests that the meaning of the word "victim" will depend on the underlying substantive statute that the defendant violated.

The legislative history sheds no light on the matter. The wording of ORS 161.067(2) can be traced to 1985, when Senate Bill 257 was introduced at the request of the Oregon Department of Justice on behalf of the Oregon District Attorneys Association. The bill was intended

"to address two related problems which have caused criminal law practitioners and the courts consternation for quite some time. The first issue is how many judgments of conviction a court may enter when a criminal defendant has, during an episode, violated several statutes, injured several

victims or violated the same statute against the same victim several times. The second issue concerns the question of when a court may sentence a defendant convicted of multiple crimes to consecutive sentences."

Staff Measure Analysis, Senate Judiciary Committee, SB 257, 1985. Up to that time, no statute existed to guide the courts about how to enter judgments when a single criminal episode might provide grounds for multiple convictions and sentences. *See generally State Cloutier*, 286 Or 579, 582-85, 596 P2d 1278 (1971) (noting incomplete legislative direction regarding possible "multiple consequences" of a "single criminal act"). SB 257 was proposed to provide the courts that needed direction. *State Crotsley*, 308 Or 272, 276-78, 779 P2d 600 (1989) (discussing legislative history of *former* ORS 161.062). The House voted in favor an amended version of SB 257, which the legislature ultimately adopted and codified at *former* ORS 161.062(2). *Id*. As enacted, the new law provided in part that, "when the same conduct or criminal episode violates only one statutory provision, but involves two or more victims, there are as many separately punishable offenses as there are victims." Or Laws 1985, ch 722, § 4(2). Nothing in the legislative history mentions any concern with the definition of the word "victim," however.

The following year, a "crime victims' bill of rights" was adopted by initiative as Ballot Measure 10 (1986). The measure recognized the rights of crime victims at trial, at sentencing, and after sentencing. For example, Measure 10 amended ORS Chapter 136 to require the trial court to take the victim into account in setting a trial date; it amended ORS 40.385 to provide that trial courts are not authorized to exclude victims from the court; it amended ORS 136.060 to require the trial court to take into consideration the crime victim's interest in determining whether to try jointly charged defendants together; it amended ORS Chapter 137 to recognize a crime victim's right to appear at sentencing; it amended ORS 137.101 to require courts to liberally construe restitution statutes in favor of victims; it amended ORS 144.120 to require the Parole Board to attempt to notify the crime victim in advance of any parole hearings and to recognize a right of the victim to appear at such hearings;

and it amended ORS 144.260 to require the Parole Board to provide the victim advance notice of any release decision. Or Laws 1987, ch 2.

Significantly for our purposes, Measure 10 also added the anti-merger provision to ORS Chapter 161 that is now ORS 161.067(2): "When the same conduct or criminal episode, though violating only one statutory provision[,] involves two or more victims, there are as many separately punishable offenses as there are victims." *Id.* § 13. That provision is nearly identical to what the legislature had just enacted the year before as *former* ORS 161.062(2). In fact, the source of the wording of the ballot measure provision was SB 257 (1985). *Crotsley*, 308 Or at 276 n 3 (noting that both ORS 161.062 and ORS 161.067 "derived from a common source").[4]

Ordinarily, when legislation has been essentially reenacted with no material change, we assume—in the absence of evidence to the contrary—that no change in meaning was intended. *See, e.g., Carter US National Bank*, 304 Or 538, 544, 747 P2d 980 (1987) ("[t]here is no indication that the legislature intended any substantive change when it repealed *former* ORS 17.605 and reenacted it as ORCP 64A"), *overruled on other grounds by Assoc. Unit Owners of Timbercrest Condo. Warren*, 352 Or 583, 288 P3d 958 (2012); *Kingery Dept. of Revenue*, 276 Or 241, 247, 554 P2d 471 (1976) ("[t]here is no evidence that the legislature intended any change in its prior statutory direction *** by its substitution of the words 'true cash value' for the words 'full and true value' when it reenacted" the statute). In this case, nothing in that history of Measure 10 suggests that the duplicate provision was intended to have a meaning different from what the legislature had just enacted.

_____

[4] As this court explained in *Crotsley*, 308 Or at 276, the same anti-merger statute, in effect, "was enacted twice," first by the legislature and second by initiative. Both provisions remained in the Oregon Revised Statutes for the next 13 years, during which time courts referred to the two statutes as being essentially interchangeable. In 1999, the legislature repealed *former* ORS 161.062, Or Laws 1999, ch 136, § 1, on the recommendation of the Oregon Law Commission, which explained that the enactment of ORS 161.067, with its nearly identical wording, had rendered the older statute obsolete. Tape Recording, Senate Committee on Judiciary, HB 2277, Feb 1, 1999, Tape 20, Side A (Statement of Rep. Lane Shetterly).

To be sure, *other* provisions of Measure 10 appear to assume that "victim" refers to persons. After all, provisions relating to the rights of victims to appear in court, to obtain restitution, and to be heard at sentencing and Parole Board hearings would be difficult to apply were "victims" to include non-human animals. The measure itself provides a definition of "victim" as "the *person or persons* who have suffered financial, social, psychological or physical harm as a result of a crime." Or Laws 1987, ch 2, § 17 (emphasis added.)

But that definition expressly applies only to certain provisions in the measure, specifically, those that amended "ORS 40.385 and * * * ORS Chapters 136, 137, and 144." *Id.* The definition of "victim" as a person does not apply to the anti-merger statute. Consequently, just as with *former* ORS 161.062(2), the otherwise undefined reference to "victim" in ORS 161.067(2) must draw its meaning from some other source.

Two of this court's decisions interpreting ORS 161.067(2) hold precisely that. The first is *Glaspey*. In that case, the defendant was found guilty of two counts of felony assault in the fourth degree, based on the fact that he had assaulted his wife in the presence of his two children. 337 Or at 560. Under ORS 163.160(3), the offense of fourth-degree assault, ordinarily a misdemeanor, is categorized a Class C felony if it is committed in the presence of, among other things, "the victim's minor child." The state argued that, because minor children who witness assaults suffer a variety of harms, each of the two children who witnessed defendant assaulting his wife were "victims," thus justifying separate convictions under ORS 161.067(2).

This court rejected that argument. The court explained that, regardless of whether the children might have been "victims" in some sense, what counts for the purposes of ORS 161.067(2) is whether they were victims under the substantive criminal statute that the defendant violated:

"When the statute speaks of criminal conduct that 'violate[s] only one statutory provision,' it necessarily refers to, and depends upon, some statute other than itself. That is,

it refers to the substantive criminal laws that define par-
ticular criminal offenses. It follows that the statutory ref-
erence to 'victims' in the phrase '[w]hen the same conduct
*** involves two or more victims' also must refer to victims
within the meaning of the substantive statute that defines
the relevant crime."

*Id.* at 563. The court then turned its attention to "whether
the child witnesses described in ORS 163.160(3)(c) are vic-
tims of the crimes that that statute defines." *Id.* The court
noted that, ordinarily, a "victim" is one "who suffers harm
that is an element of the offense." *Id.* at 565. The underly-
ing substantive statute may use the term "victim," but, even
then, that is regarded as "context" for the purposes of deter-
mining the controlling question of legislative intent. *Id.* at
566. In that particular case, the court explained, the word-
ing of the statute in context compelled the conclusion that
the legislature considered the "victim" to be the person who
is physically assaulted, not the children. *Id.* at 565.

   The second case is *State Hamilton*, 348 Or 371, 233
P3d 432 (2010). In that case, the defendant was found guilty
of seven counts of first- and second-degree robbery, based on
an incident in which the defendant robbed a bar at gunpoint
in the presence of the owner, two employees, and four cus-
tomers. *Id.* at 373-74. The defendant argued that the multi-
ple robbery counts should have merged into a single convic-
tion, because he committed only a single robbery against the
bar owner. *Id.* The state argued that each of the witnesses
to the robbery was a victim and, as a result, separate con-
victions were appropriate under ORS 161.067(2). *Hamilton*,
348 Or at 376.

   This court agreed with the state. Citing *Glaspey*,
the court began by stating that, "[i]n analyzing whether a
crime involves 'two or more victims' within the meaning of
ORS 161.067(2), this court determines who qualifies as a
'victim' by interpreting the substantive statute defining the
relevant crime." *Hamilton*, 348 Or at 376. Turning to the
text, context, and legislative history of the robbery statutes,
the court concluded that the "victim" of a robbery includes
any person against whom a defendant uses or threatens vio-
lence in the course of committing a theft, not only the owner
of the property. *Id.* at 377-79.

To summarize our analysis so far: The ordinary meaning of the word "victim" as it is used in ORS 161.067(2) can include both human and non-human animals, and nothing in the text, context, or legislative history of the statute necessarily precludes an animal from being regarded as such. This court's cases construing the term "victim" as it is used in that statute hold that, in fact, the meaning of the term is not to be found in an analysis of ORS 161.067(2) itself, but rather, it derives from the underlying substantive criminal statute that defendant has been found to have violated.

Whether each of the animals that defendant neglected was a "victim" for the purposes of the anti-merger statute, then, depends on whether the legislature regarded them as such for the purposes of the substantive offense of second-degree animal neglect. More particularly, it depends on "who suffers harm that is an element of the offense." *Glaspey*, 337 Or at 565. We turn to that issue.

ORS 167.325 (2009) provides:

> "A person commits the crime of animal neglect in the second degree if, except as otherwise authorized by law, the person intentionally, knowingly, recklessly or with criminal negligence fails to provide minimum care for an animal in such person's custody or control."

An "animal" means "any nonhuman mammal, bird, reptile, amphibian or fish." ORS 167.310(1) (2009). "Minimum care" refers to "care sufficient to preserve the health and well-being of an animal and, except for emergencies or circumstances beyond the reasonable control of the owner, includes, but is not limited to," such requirements as food, water, shelter, and reasonably necessary veterinary care. ORS 167.310(7) (2009). For domesticated animals, "minimum care" also includes access to adequate shelter, continuous access to an area that is adequate for "exercise necessary for the health of the animal," being kept at a "temperature suitable for the animal," and being "[k]ept reasonably clean and free from excess waste or other contaminants that could affect the animal's health." *Id.*

The phrasing of the offense reveals that the legislature's focus was the treatment of individual animals,

not harm to the public generally or harm to the owners of the animals. The offense is committed by failing to provide required care to "an animal," regardless of who owns it. The required care includes the minimum necessary "to preserve the health and well-being" of that animal. It is the individual animal that "suffers harm that is an element of the offense." *Glaspey*, 337 Or at 565.

The larger context of the statutory offense confirms that the legislature's focus is on the treatment of individual animals. Second-degree animal neglect is a component of a more comprehensive set of offenses concerning the care of animals, offenses that are structured to correspond to the extent of an animal's suffering. The statutes begin with animal neglect in the second degree, which, as we have noted, is committed when a person fails to provide minimum care. When the person's failure to provide minimum care "results in serious physical injury or death to the animal," that person commits animal neglect in the first degree. ORS 167.330. When a person "intentionally, knowingly, or recklessly causes physical injury to an animal," that person commits the offense of animal abuse in the second degree. ORS 167.315. And when a person intentionally, knowingly, or recklessly causes "serious physical injury" or "[c]ruelly causes the death of an animal," that person commits animal abuse in the first degree. ORS 167.320. Finally, when a person "[m]aliciously kills an animal" or "[i]ntentionally or knowingly tortures an animal," that person commits the offense of aggravated animal abuse in the first degree, a Class C felony. ORS 167.322.

In each instance, the offense is committed against "an animal," and the relative seriousness of the offense is gauged in accordance with the relative degree of harm to or suffering of that animal. If the animal suffers a lack of minimum care, the offense is second-degree animal neglect. But if the animal is subjected to torture, the offense is felony aggravated animal abuse. In any reasonable sense of the word, the "victim" of those offenses is the individual animal that suffers the neglect, injury, cruelty, torture, or death.

Other aspects of the larger statutory scheme similarly confirm the legislature's focus on the suffering of

individual animals. ORS 167.350, for example, provides that, in addition to other penalties that a court may impose for violations of the animal cruelty laws, the court may order the forfeiture of a defendant's rights in the animal. ORS 167.350(1). The same statute provides that, if a court orders such a forfeiture, it may further order "that the rights be given over to an appropriate person or agency demonstrating a willingness to accept and care for the animal." ORS 167.350(2). The statute also provides that a court may also require the owner to repay the reasonable costs incurred by any person or agency caring for the animal during the pendency of the charges. In each instance, again, the focus is on the care of the animal who has suffered the harm of neglect or abuse. ORS 167.350(3)

The legislative history of ORS 167.325, particularly in the larger context of the history of animal cruelty legislation, confirms what our textual analysis so strongly suggests. At common law, cruelty to animals did not constitute an offense. *See State Bruner*, 12 NE 103, 104 (1887) ("There is a well-defined difference between the offense of malicious or mischievous injury to property, and that of cruelty to animals. The former constituted an indictable offense at common law, while the latter did not."); *State Beekman*, 27 NJL 124, 125 (1858) ("The general rule is that no injuries of a private nature [including wounding an animal], unless they some way concern the king or affect the public, are indictable at common law.").

The first animal cruelty legislation on this continent can be traced to the Puritan "Body of Liberties" from the Massachusetts Bay Colony, which prohibited cruelty to "any bruite [sic] Creature which are usuallie [sic] kept for man's use." Massachusetts Body of Liberties § 92 (Ward 1641); Thomas G. Kelch, *A Short History of (Mostly) Western Animal Law: Part II*, 19 Animal L 347, 350 (2013) (quoting Body of Liberties). By its terms, the law protected the animals only as property of their owners, and even then, only as to commercially valuable animals that were "usuallie kept for man's use."

That view of animals as the property of their owners, and subject to protection only as such, is reflected in animal

cruelty legislation adopted by the states throughout the next several centuries. *See generally* David Favre & Vivian Tsang, *The Development of Anti-Cruelty Laws During the 1800s*, 1 Det C L Rev 1 (1993); Deborah J. Challener, *Protecting Cats and Dogs in Order to Protect Humans: Making the Case for a Felony Companion Animal Statute in Mississippi*, 29 Miss C L Rev 499, 501 (2010) ("Although these laws afforded some protection to certain kinds of animals, their primary focus was not animal welfare. Instead, animal cruelty was criminalized in order to (1) protect the property rights of those who owned commercially valuable animals, such as cows, horses and oxen; and (2) prevent harm to human beings.").

In the nineteenth through the twentieth centuries, some states began to pass anti-cruelty laws that were intended to deter immoral conduct; the emphasis still was not on protecting the animals themselves. *See, e.g.*, *Johnson District of Columbia*, 30 App DC 520, 522 (DC 1908) (prevention of animal cruelty "is in the interest of peace and order and conducive to the morals and general welfare of the community"); *see also* Gary L. Francione, *Animals, Property and Legal Welfarism: "Unnecessary" Suffering and the "Humane" Treatment of Animals*, 46 Rutgers L Rev 721, 754 (1994) ("the purpose of the statutes is to improve human character not to protect animals"). The 1962 Model Penal Code provision on animal cruelty, for example, provided:

> "A person commits a petty misdemeanor if he purposely or recklessly:
>
> "(1)   subjects any animal to cruel mistreatment; or
>
> "(2)   subjects any animal in his custody to cruel neglect; or
>
> "(3)   kills or injures any animal belonging to another without legal privilege or consent of the owner.
>
> "Subsections (1) and (2) shall not be deemed applicable to accepted veterinary practices and activities carried on for scientific research."

Model Penal Code § 250.11 (1962). According to the commentary to that provision, "[c]ruelty to animals is another class of behavior widely penalized because of outrage to the feelings of substantial groups in the population." Model Penal

Code and Commentaries (Tentative Draft No. 13), American Law Institute 40, § 250.6 (1962).

Other states, however, enacted legislation targeting cruelty to animals for the sake of preventing the animals themselves from suffering, not merely as property to be protected or as a way of improving public morality. New York's 1867 animal cruelty law, adopted "for the more effectual prevention of cruelty to animals," is often credited with being the first such statute. *See generally* Laurie Serafino, *No Walk in the Park: Drafting Animal Cruelty Statutes to Resolve Double Jeopardy Concerns and Eliminate Unfettered Prosecutorial Discretion*, 78 Tenn L Rev 1119, 1123-27 (2011) (discussing the historical foundation of modern anti-cruelty statutes); Luis E. Chiesa, *Why Is It a Crime to Stomp on a Goldfish?—Harm, Victimhood and the Structure of Anti-Cruelty Offenses*, 78 Miss LJ 1 (2008). The law provided that,

> "[i]f any person shall over-drive, over-load, torture, torment, deprive of necessary sustenance, or unnecessarily cruelly beat, or needlessly mutilate or kill, or cause or procure to be over-driven, over-loaded, tortured, tormented or deprived of necessary sustenance, or to be unnecessarily or cruelly beaten, or needlessly mutilated, or killed as aforesaid any living creature, every such offender shall, for every such offense, be guilty of a misdemeanor."

1867 Gen Stats NY, ch 375, § 1.

New York's animal cruelty statute became a model for many other states, which adopted animal cruelty laws in the late-nineteenth and early twentieth centuries. *See, e.g.*, Mass Gen L, ch 344 (1869); 1869 Ill Laws 3; NJ Rev Stat 64-82 (1873); 1878 NH Laws 281; 1900 Cal Stat § 597; 14 Pa Stat § 7772 (1920); Mich Comp Laws ch 285 § 1 (1929). Oregon was one of the states that followed the New York model of animal cruelty legislation. Adopted in 1885, Oregon's statute provided:

> "Whoever overdrives, or overloads, drives when overloaded, overworks, tortures, torments, deprives of necessary sustenance, cruelly beats, mutilates, or cruelly kills, or causes or procures to be so overdriven or overloaded, driven when overloaded, overworked, tortured, tormented, deprived of

necessary sustenance, cruelly beaten, mutilated or cruelly killed, any animal; and whoever having the charge of or custody of any animal, either as owner or otherwise, inflicts cruelty upon the same, shall, for every such offense be punished by imprisonment in the county jail not exceeding sixty days, or by fine not exceeding one hundred dollars, or by both fine and imprisonment."

Lord's Oregon Laws § 2103 (1885). The courts recognized that the focus of the statute was the treatment of the animals themselves, with no mention of proof of economic loss to the owner or harm to the public. In *State Goodall*, 90 Or 485, 175 P 857 (1918), for example, this court held that evidence that the defendant rode a horse while it had a deep ulcerated sore on its back and that the defendant had supplied it with insufficient food was enough to establish violation of animal cruelty statute. *Id*. at 488-89. In the court's view, "[i]t is clear that the act of riding a horse in such condition *** constitutes the crime of 'torturing and tormenting an animal,' as is also the act of depriving the animal of necessary sustenance." *Id*. at 489.

In 1971, the legislature adopted the new Oregon Criminal Code. In that new code, the legislature retained the nearly century-old animal cruelty statute, codified at ORS 167.860 (1971). But it added a provision based on the Model Penal Code (or, more precisely, based on a Michigan statute that was, in turn, based on the Model Penal Code). Criminal Law Revision Commission, Proposed Criminal Code, Final Draft and Report § 226 (July 1970). The new law, codified at ORS 167.850 (1971), provided in part:

"(1)   A person commits the crime of cruelty to animals if, except as authorized by law, he intentionally or recklessly:

"(a)   Subjects any animal under human custody or control to cruel mistreatment; or

"(b)   Subjects any animal under his custody or control to cruel neglect; or

"(c)   Kills without legal privilege any animal under the custody or control of another."

The legislature later overhauled the state's animal cruelty laws in 1985 with the enactment of Senate Bill 508,

which now constitutes, with amendments not pertinent to this case, the state's current animal cruelty statute. The staff measure summary described the bill's purpose in the following terms:

> "In some respects the public's attitude regarding animals has undergone substantial change. Many people feel that animals should be given greater protection from cruel treatment and neglect. The traditional statutes relating to cruel treatment of animals are seen as inadequate in that they only prohibit extreme conduct and do not differentiate between abuse and neglect. This bill addresses those concerns."

Staff Measure Analysis, Senate Judiciary Committee, SB 508, Mar 14 1985, 1. Senate Bill 508 repealed both the old animal cruelty statute and the newer provision adopted in 1971 and replaced them with a comprehensive set of offenses, ranging from animal abandonment to animal neglect in the first and second degrees and to animal abuse in the first and second degrees. The bill also established detailed criteria for determining what constitutes the "minimum care" to which animals are entitled. *Id*.

The bill was proposed by the Humane Society of the Willamette Valley, which had developed the proposal after consultation with the State Police, the Farm Bureau, the livestock association, and other humane societies. Tim Greyhavens, the Executive Director of the society, explained to the Senate Judiciary Committee that the purpose of the bill was to provide clarity about what constitutes actionable cruelty to animals and to expand the law to include an offense of animal abandonment. He said that current law was too vague about what constituted mistreatment and cruelty. Minutes, Senate Judiciary Committee, SB 508, Mar 14, 1985, at 4 (testimony of Tim Greyhavens). He explained that the bill was intended to separate and define specific offenses against animals, with the difference between those offenses being "the extent of the harm" to the animals. *Id*. at 5.

Greyhavens similarly testified before the House Committee on Judiciary that the bill was needed because current law was too vague about what constitutes cruelty to animals and that the law needed to be broadened to

cover animal abandonment. Minutes, House Committee on Judiciary, SB 508, June 12, 1985, at 18 (testimony of Tim Greyhavens). He offered a statement from a dozen other humane societies representing more than 10,000 members around the state urging support of the bill. "By enacting Senate Bill 508," the statement declared, "you will be preventing needless suffering" and saving thousands of dollars related to the care of stray and abandoned pets. Statement, House Judiciary Committee, HB 508, June 12, 1985, Ex F, 1 (Humane Society of the Willamette Valley).

Marion County Reserve Deputy Sheriff David Hemphill also testified in support of the bill. He explained that, as an animal cruelty investigator,

"I see dozens of cases of animal abandonment, abuse and neglect that I can't take action against because of the inadequacy of our current law. Much of this law was written *** when there were different problems with the care of animals. This leaves us with a law that now contains many vague or archaic terms. For example, our current law prohibits many acts that happened during those times when animals were used primarily for work purposes, such as 'overloading' or 'overworking' a horse or 'works an animal when unfit for labor.'"

Testimony, House Judiciary Committee, HB 508, June 12, 1985, Ex E, 1 (statement of David Hemphill). Hemphill explained that our highly mobile society is resulting in "an epidemic of animal abandonment and neglect." *Id.* at 1. "If there were a strong law that prohibited any type of animal abandonment," he argued, "many animals' lives could be saved." *Id.* Hemphill urged the committee to recommend passage of the bill "on behalf of all responsible pet owners and the animals as well, so that we can continue to make our state a better place for every living being." *Id.* at 3.

The preceding history confirms that the principal purpose of adopting the legislation that became ORS 167.325 was to prevent the suffering of animals. Although early animal cruelty legislation may have been directed at protecting animals as property of their owners or as a means of promoting public morality, Oregon's animal cruelty laws have been rooted—for nearly a century—in a different legislative

tradition of protecting individual animals themselves from suffering. Indeed, the modern animal cruelty statute was designed to broaden the state's earlier law to encompass abandonment, as well as neglect and abuse, and to graduate punishment in accordance with the severity of the harm to the animals.

We therefore conclude that defendant is incorrect that the real "victim" of the crime of second-degree animal neglect is either the public or the animal owner. It is true that, for a brief period of time—from 1971 to 1985—Oregon's statutes included an additional provision that reflected the Model Penal Code's concern that animal cruelty is a matter of public morality. But that provision reflected an *additional* layer of legislative policy on top of the longstanding concern with protecting animals from suffering for the sake of the animals themselves. In any event, that provision was repealed in 1985, replaced by the comprehensive scheme of animal cruelty laws that we have described, all of which are predicated on preventing the suffering of animals. Moreover, *Glaspey* makes clear that the "victim," for the purposes of ORS 161.067(2), is the one that "suffers harm that is an element of the offense." *Glaspey*, 337 Or at 565. Public harm is not an element of the offense of second-degree animal neglect. Harm to the individual animal is.

Nor is there in any indication that the legislature regarded the "victim" of animal neglect to be the owner of the animal. To be sure, Oregon law regards animals as the property of their owners. *See generally State Fessenden / Dicke*, 355 Or ___, ___, ___ P3d ___ (2014) (so noting, citing relevant statutes). But it does not necessarily follow from that fact that owners of abused or neglected animals are the victims of the offense. Indeed, it would be anomalous to conclude that the "victim" of animal neglect is the owner of the animal when it is the owner who is charged with having committed the offense.[5] What is more, ORS 167.325 provides that, in the event of a conviction for animal neglect or animal cruelty, a court may order that the defendant forfeit any

---

[5] Of course, animal cruelty offenses may be committed by persons other than the owner of the animal. We do not need to address whether, in those circumstances, the owner—in addition to the animal—may be regarded as a victim of the offense, and we express no opinion on that issue.

rights he or she had in the animal that has been neglected or abused—an odd consequence if the real victim of the offense is the animal's owner.

In concluding that animals are "victims" for the purposes of ORS 161.067(2), we emphasize that our decision is not one of policy about whether animals are deserving of such treatment under the law. That is a matter for the legislature. Our decision is based on precedent and on a careful evaluation of the legislature's intentions as expressed in statutory enactments. Our prior decisions hold that the meaning of the word "victim" for the purposes of ORS 161.067(2) necessarily depends on what the legislature intended in adopting the underlying substantive criminal statute that the defendant violated. In this case, the underlying substantive criminal statute, ORS 167.325, protects individual animals from suffering from neglect. In adopting that statute, the legislature regarded those animals as the "victims" of the offense. It necessarily follows that the trial court in this case erred in merging the 20 counts of second-degree animal neglect into a single conviction.

The decision of the Court of Appeals is affirmed. The judgment of the circuit court is reversed, and the case is remanded for entry of separate convictions on each guilty verdict for a violation of ORS 167.325 and for resentencing.