TOOKEY, J.
*89 This criminal case requires us to determine whether 11 miniature horses, multiple cats, and a dog are separate victims for purposes of merger. Defendant appeals a judgment of conviction for 13 counts of unlawful possession of an animal by a person previously convicted of second-degree animal neglect. ORS 167.332(1)(a).[1] On appeal, defendant raises seven assignments of error. We reject defendant's first assignment of error without further written discussion. In a combined argument pursuant to ORAP 5.45(6), defendant contends in her second through seventh assignments of error that the trial court erred by failing to merge a number of the guilty verdicts for unlawful possession of an animal "because the public is the single collective victim of defendant's violation of ORS 167.332(1)(a) for purposes of merger." We disagree; the legislature's purpose in enacting the provisions of ORS 167.332(1)(a), which prevent a person with convictions for crimes against animals from possessing animals, was to protect individual animals from suffering. And because we conclude that each unlawfully possessed animal is a separate victim, the trial court did not err when it entered 13 separate convictions for unlawful possession of an animal. Accordingly, we affirm.
A lengthy recitation of the facts of this case will not benefit the bench, the bar, or the public. Within the five years preceding this case, defendant was convicted of multiple counts of second-degree animal neglect involving dogs and miniature horses. Later, following an investigation, defendant was indicted for unlawfully possessing 11 miniature horses, "multiple cats," and a dog. The trial court found defendant guilty of 13 counts of unlawful possession of an animal by a person previously convicted of second-degree animal neglect. At sentencing, defendant argued that the trial court should merge those guilty verdicts because animals *90 are not separate victims for purposes of ORS 167.332(1)(a). The trial court rejected defendant's merger argument and entered 13 separate convictions for unlawful possession of an animal.
On appeal, defendant reprises her argument that "the public is the single collective victim of defendant's violation of ORS 167.332(1)(a)" and, hence, the trial court erred when it entered 13 separate convictions for unlawful possession of an animal. Defendant contends that the unlawful possession of multiple animals under ORS 167.332(1)(a) is analogous to the unlawful possession of multiple firearms by a felon under ORS 166.270. See State v. Torres , 249 Or. App. 571, 578, 277 P.3d 641, rev. den. , 352 Or. 378, 290 P.3d 814 (2012) (because "the legislature acted within its proper authority to restrict the possession of arms by members of a group whose conduct demonstrates an identifiable threat to public safety ," the "public is a single collective 'victim' of a violation of ORS 166.270 for purposes of merger" (emphasis in original) ).
Not surprisingly, the state responds that defendant "does not grapple with the fact that animals, unlike firearms, are living beings that can be the victims of crime." The state also argues that "the legislature intended *1055 for each animal unlawfully possessed to be considered a separate victim of the crime, justifying separate convictions."[2]
ORS 161.067(2) provides, in part, "[w]hen the same conduct or criminal episode, though violating only one statutory provision involves two or more victims, there are as many separately punishable offenses as there are victims." To determine "whether a crime involves 'two or more victims' within the meaning of ORS 161.067(2)," we interpret "the substantive statute defining the relevant crime" by "examin[ing] the text of the pertinent statute in context, and then, to the extent that we find it helpful, we consider legislative history proffered by the parties." State v. Hamilton , 348 Or. 371, 376-77, 233 P.3d 432 (2010) ; see also State v. Moncada , 241 Or. App. 202, 212, 250 P.3d 31 (2011), rev. den. , 351 Or. 545, 274 P.3d 184 (2012) ("Where the statute defining a crime does *91 not expressly identify *** who qualifies as a 'victim,' the court examines the statute to identify the gravamen of the crime and determine *** whom the legislature intended to directly protect by way of the criminal proscription."). Thus, "[t]he issue before us is one of statutory construction, which we resolve by applying the familiar principles set out in PGE v. Bureau of Labor and Industries , 317 Or. 606, 610-12, 859 P.2d 1143 (1993), and State v. Gaines , 346 Or. 160, 171-73, 206 P.3d 1042 (2009)." State v. Nix , 355 Or. 777, 781-82, 334 P.3d 437 (2014), vac'd , 356 Or. 768, 345 P.3d 416 (2015).[3]
We begin with the text of the statute, in context. ORS 167.332(1)(a) provides, in part, that "a person convicted of [second-degree animal neglect,] *** [ORS] 167.325, *** may not possess a domestic animal or any animal of the same genus against which the crime was committed for a period of five years following entry of the conviction." Public harm is not an element of that offense. And, although ORS 167.332(1)(a) does not require the state to prove that the unlawfully possessed animal actually suffered harm as an element of that offense, the statutory text of ORS 167.332 (1)(a) in context indicates that the legislature intended to "protect[ ] individual animals themselves from suffering." Nix , 355 Or. at 797, 334 P.3d 437.
As noted above, the state observes that "animals, unlike firearms, are living beings that can be the victims of crime." See State v. Hess , 273 Or. App. 26, 35, 359 P.3d 288 (2015), rev. den. , 358 Or. 529, 367 P.3d 529 (2016) (adopting the Supreme Court's reasoning in Nix , and concluding that animals are separate victims for purposes of merger in animal neglect cases). In 2013, the legislature explicitly found and declared that "[a]nimals are sentient beings capable of experiencing pain, stress and fear," ORS 167.305(1), and that "[a]nimals should be cared for in ways that minimize pain, stress, fear and suffering," ORS 167.305(2). Or. Laws 2013, ch. 719, § 1; see State v. Newcomb , 359 Or. 756, 767 n. 10, 375 P.3d 434 (2016) (quoting ORS 167.305"as background relevant to an overall understanding of the animal welfare laws and the policies that current and past statutes reflect"). ORS 167.332(1)(a)
*92 protects animals from experiencing pain, stress, and fear by prohibiting a person convicted of certain crimes against animals from possessing domestic animals for five years following entry of the conviction. The legislature's intention to protect individual animals from suffering is further evidenced by the fact that the prohibition on animal possession under ORS 167.332(1)(a) also specifically prohibits the person from possessing "any animal of the same genus against which the crime was committed." Or. Laws 2013, ch. 719, § 6.
Thus, by amending ORS 167.332(1)(a) in 2013, the legislature prohibited the possession of animals by individuals whose conduct demonstrates an identifiable threat to a particular genus of animal. Id . The prohibition on possessing the particular genus of animal against which the underlying crime was committed reveals that the legislature's focus was on the protection of individual animals *1056 from abuse or neglect, not harm to the public generally.
The larger context of the statutory offense also confirms that the legislature's focus was on the development of a comprehensive statutory scheme to protect individual animals from abuse and neglect. ORS 167.332 is part of Oregon's "comprehensive scheme of animal cruelty laws[,] *** all of which are predicated on preventing the suffering of animals. Nix , 355 Or. at 797, 334 P.3d 437 (emphasis added); see also State v. Fessenden/Dicke , 355 Or. 759, 773, 333 P.3d 278 (2014) (upholding officer's warrantless seizure of a horse to prevent imminent harm, and noting that "animals are 'victims' for purposes of animal welfare statutes"). The relative seriousness of the offense under Oregon's animal cruelty laws "is gauged in accordance with the relative degree of harm to or suffering of th[e] animal." Nix , 355 Or. at 790, 334 P.3d 437. For example, when a person intentionally, knowingly, recklessly or with criminal negligence, "[f]ails to provide minimum care for an animal in such person's custody or control," that person commits second-degree animal neglect, a Class B misdemeanor. ORS 167.325(1)(a). When that person's failure to provide minimum care "results in serious physical injury or death to the animal," that person commits first-degree animal neglect, a Class A misdemeanor. ORS 167.330 (1)(a). When a person "intentionally, knowingly or recklessly *93 causes physical injury to an animal," that person commits second-degree animal abuse, a Class B misdemeanor. ORS 167.315(1). And when a person intentionally, knowingly or recklessly "[c]auses serious physical injury to an animal" or "[c]ruely causes the death of an animal," that person commits the crime of first-degree animal abuse, a Class A misdemeanor. ORS 167.320(1).[4] Finally, when a person "[m]aliciously kills an animal" or "[i]ntentionally or knowingly tortures an animal," that person commits the crime of first-degree aggravated animal abuse, a Class C felony. ORS 167.322(1).
Likewise, the length of the prohibition on the possession of animals also corresponds to the degree of harm or suffering experienced by the animal against which the predicate offense was committed. ORS 167.332(1)(a) prohibits a person convicted of misdemeanor animal abuse, animal neglect, sexual assault of an animal, animal abandonment, or involvement in animal fighting, from possessing a domestic animal or any animal of the same genus against which the crime was committed for five years following entry of the conviction. ORS 167.332(1)(b) prohibits a person convicted of first-degree aggravated animal abuse, dog fighting, cockfighting, or felony first-degree animal abuse, from possessing any domestic animals or any animal of the same genus against which the crime was committed for 15 years following entry of the conviction.[5] The fact that the length of the prohibition on possessing animals is gauged in accordance with the relative degree of "pain, stress, fear and suffering" experienced by the animal against which the predicate offense was committed, confirms that the legislature's focus was on the protection of individual animals. ORS 167.305(2).[6]
*94 Other provisions of the statutory scheme similarly confirm that the legislature's focus was on the development of a comprehensive statutory scheme to protect individual animals from abuse and neglect. ORS 167.332(2) provides, in part:
"When a person is convicted of [unlawfully] possessing an animal[,] * * * as part of the sentence the court may order the removal of that animal from the person's residence and may prohibit the person from possessing any animal of the same genus that the person unlawfully possessed *1057 * * * or against which the underlying violation * * * was committed."
Similarly, ORS 167.350(1) authorizes a court to order a defendant convicted of unlawful possession of an animal "to forfeit any rights of the defendant in the animal subjected to the violation." See also ORS 167.347 (authorizing court to order forfeiture of impounded animals prior to the final disposition of the criminal action when the defendant is charged with unlawfully possessing an animal). Additionally, if the court orders such a forfeiture, "the court may further order that those rights be given over to an appropriate person or agency demonstrating a willingness to accept and care for the animal[,]" and "may not transfer the defendant's rights in the animal to any person who resides with the defendant." ORS 167.350(2)(a). Furthermore, "[t]he court shall require a person to whom rights are granted to execute an agreement to provide minimum care to the animal," and "[t]he agreement must indicate that allowing the defendant to possess the animal constitutes a crime." ORS 167.350(2)(b) ; see also ORS 167.348 (if an agency places the forfeited animal with a new owner, "the agency may not place the animal with any person who resides with the former owner," the agency "shall require the new owner to execute an agreement to provide minimum care to the animal," and "[t]he agreement must indicate that allowing the former owner to possess the animal constitutes a crime"); ORS 167.349 (a person commits the crime of encouraging animal abuse if the person obtains a forfeited animal and "[k]nowingly allows the person from whom the animal was forfeited to possess the animal"). In each instance, again, we emphasize that the focus of those provisions is on the care of the individual animal and preventing abuse or neglect.
*95 The legislative history of ORS 167.332(1)(a), particularly in the larger context of the history of the animal cruelty laws, confirms that the legislature intended to protect individual animals from suffering. In Nix , the Supreme Court conducted an in-depth examination of the development of Oregon's animal cruelty laws throughout the nineteenth and twentieth centuries. The court concluded that,
"[a]lthough early animal cruelty legislation may have been directed at protecting animals as property of their owners or as a means of promoting public morality, Oregon's animal cruelty laws have been rooted-for nearly a century-in a different legislative tradition of protecting individual animals themselves from suffering."
Nix , 355 Or. at 796-97, 334 P.3d 437.
In 2001, the legislature enacted Senate Bill (SB) 230, which included a prohibition on the possession of domestic animals by people with certain convictions for animal abandonment, animal neglect, or animal abuse. The prohibition on possessing domestic animals was only one of the numerous amendments to the animal cruelty laws that were proposed in SB 230. To support her argument that the public is the single victim of defendant's unlawful possession of several animals, defendant points to statements that were made at a public hearing on SB 230 on May 17, 2001, concerning the link between animal abuse and violence against humans. Defendant contends that the link between animal abuse and violence against humans demonstrates that the legislature intended to protect the public when it enacted the provisions of ORS 167.332(1), which prevented a person with convictions for crimes against animals from possessing domestic animals.
We conclude that the legislative history proffered by defendant is unhelpful to our analysis. Among the numerous amendments proposed in SB 230, was a requirement that juveniles undergo a psychiatric evaluation if they are adjudicated for abusing an animal, and to elevate first-degree animal abuse to a Class C felony if the person has been convicted of certain offenses committed against a minor child or involving domestic violence, or if the person abused the animal in the immediate presence of a child. See Or. Laws *96 2001, ch. 926, §§ 4-5 (authorizing courts to order psychiatric, psychological or mental health evaluation and appropriate care or treatment); Or. Laws 2001, ch. 926, § 8 (making first-degree animal abuse a Class C felony if the defendant has a prior conviction for first-degree animal abuse, first-degree aggravated animal abuse, certain offenses committed *1058 against a minor child or involving domestic violence, or if the person commits the animal abuse in the immediate presence of a minor child). The statements that defendant points to, concerning the connection between animal abuse and human violence, were made with respect to those amendments.[7] Our review of this legislative history related to SB 230 does not reveal any indication that the possession ban set forth in ORS 167.332(1) was enacted to protect humans or the public as a whole as defendant contends.
The legislative history of SB 230 also included discussions about adding a definition for "physical injury" that would facilitate the enforcement of the animal cruelty laws because, at that time, the animal cruelty laws used the definition of physical injury set forth in ORS 161.015, and it was difficult for the state to prove that the animal suffered "impairment of physical condition or substantial pain." ORS 161.015(7). Senator Ryan Deckert sponsored SB 230; in his opening comments about the bill during the February 15 public hearing in the Senate Committee on the Judiciary, Senator Deckert stated that "this bill came about *** [after] a number of [reports] in the media *** about Rose-Tu at the Oregon Zoo" and the inability to prosecute the individual who committed "the abuse of th[at] elephant at the zoo." Audio Recording, Senate Committee on Judiciary, SB 230, Feb. 15, 2001, at 1:35:45 (comments of Sen. Deckert), http://records.sos.state.or.us/ORSOSWebDrawer/
*97 Record/4160408# (accessed Sept. 5, 2018). At the same hearing, Stephan Otto, who participated in the development of the work-group draft, which became SB 230, explained that "Oregon's law enforcement community has identified problems in sections of the current laws that make it extremely difficult, if not impossible, to successfully prosecute many serious cases of animal abuse," and, in particular, he identified "the current definition of physical injury suffered by an animal" because "[t]he current definition borrows the same definition that we use for physical injury on a person." Id . at 1:44:20 (comments of Stephan Otto on behalf of the Animal Legal Defense Fund). See Or. Laws 2001, ch. 926, § 7 (defining "physical injury" for purposes of the animal cruelty laws under ORS 167.310 as "physical trauma, impairment of physical condition or substantial pain," and defining "physical trauma" as "fractures, cuts, punctures, bruises, burns or other wounds").
In light of the comprehensive nature of SB 230, the legislative history regarding the prohibition on possessing domestic animals is sparse. Karen Haberle, who witnessed the abuse of Rose-Tu with her son and identified problems with the enforcement of the animal cruelty laws to Senator Deckert, stated that "[i]t is very hard to sit here and explain my witness of Rose-Tu being abused because [the perpetrator] is still able to have access to animals" after "Rose-Tu received 176 wounds plus other injuries at the hands of [the perpetrator]." Id . at 1:40:50 (comments of Karen Haberle). Likewise, in written testimony in support of SB 230, Diane Heller stated, "Abuse and neglect *** could all be avoided had that person never been allowed to own an animal in the first place." Testimony, House Committee on Judiciary, Subcommittee on Criminal Law, SB 230, May 17, 2001, Ex C (statement of Diane Heller). Thus, although the legislative history specific to the prohibition on possessing domestic animals is sparse, the legislative history supports our conclusion that it was intended to protect individual animals from suffering abuse and neglect.
That conclusion is confirmed by a subsequent amendment to ORS 167.332, which demonstrates that the legislature's focus was *1059 on protecting individual animals as *98 sentient beings. In 2013, Senate President Peter Courtney and Senator Floyd Prozanski introduced Senate Bill (SB) 6. During the first public hearing on SB 6, Senate President Courtney testified that he introduced the bill, in part, to "[c]larify [the] law to say that abusers may not lawfully own an animal of the same genus that they have been convicted of abusing or neglecting." Testimony, Senate Committee on Judiciary, SB 6, Mar. 25, 2013, Ex 1 (statement of Sen. Peter Courtney). At the same hearing, Sharon Harmon, the Executive Director of the Oregon Humane Society, provided written testimony to the Senate Committee on Judiciary stating that the "possession ban is one of the strongest tools that Oregon's animal cruelty code provides," and explaining the need to expand the possession ban to include animals other than domestic animals because, "[i]f an individual is convicted of a crime involving animals, it only follows that they would be subject to an animal possession ban that is customized to their crime." Testimony, Senate Committee on Judiciary, SB 6, Mar. 25, 2013, Ex 5 (statement of Sharon Harmon). Harmon further explained that "[a] defendant who starves his horses to death will be indifferent to a sentence that forbids him to own a cat, but strip him of his ability to acquire more equines and the statute then functions as a deterrent to equine neglect in the first place." Id . Likewise, Lora Dunn, an extern for the Animal Legal Defense Fund, submitted written testimony during that hearing in support of SB 6 stating that that clarification was necessary because "someone convicted of abandoning their horses to starve and die could be banned from owing dogs, cats and rabbits for the next five years-but is free to own more horses." Testimony, Senate Committee on Judiciary, SB 6, Mar. 25, 2013, Ex 4 (statement of Lora Dunn).
Individuals tasked with enforcing Oregon's animal cruelty laws also testified in support of SB 6 by sharing their experiences in the field to demonstrate the heightened need for the possession ban under ORS 167.332 to apply to animals of the same genus against which the crime was committed. Jean Kunkle, on behalf of the Oregon District Attorneys Association and the Marion County District Attorney, testified that updating the possession ban was important because,
*99 "we have [had] a number of horse neglect cases over the last year in Marion County, all them involving multiple horses, all of them involving starvation and death of such horses, and I think that it is important to add that to the statute of prohibiting possession of those animals should the person be convicted of a neglect or abuse charge."
Audio Recording, Senate Committee on Judiciary, SB 6, Mar. 25, 2013, at 11:40 (comments of Jean Kunkle), http://oregon.granicus.com/MediaPlayer.php?clip_id=1931 (accessed Sept. 5, 2018). Deputy Lee Bartholomew, on behalf of the Douglas County Sherriff's Office and the Oregon Animal Control Counsel, testified that the passage of SB 6 was necessary to "make sure people do not repeat offend" and discussed a case in which
"a horse was taken [because] the horse was extremely emaciated, and when we went to court, the two people who caused the horse to be that way * * * were convicted of a misdemeanor and actually served jail time for it, but because of the way the law was written, we could not keep them from getting more horses. We could keep them from getting more domestic animals like dogs and cats, but the way the law is written did not include equines or livestock or other genus of animals that were not considered domestic."
Id . at 18:08 (comments of Deputy Lee Bartholomew).[8] Scott Beckstead, the Senior Oregon *1060 Director for the Humane Society of the United States, discussed some of the animal neglect cases in which he had assisted law enforcement. Id . at 41:20 (comments of Scott Beckstead). Beckstead first described a case in Sutherlin, Oregon, "involving 20 some goats," and noted that,
*100 "because of the way the law is currently written, [the defendants] were ordered not to possess a domestic animal as part of their sentence, but because domestic animal is defined in Oregon law to exclude livestock and equines, there is nothing in the sentence to prevent those people from going out and getting more animals and neglecting them again.
"Similarly, in Harney County in 2009, I went out and assisted in probably the worst case I have ever seen. Animal dealers who bought cattle and horses and brought them to their property where there was absolutely no feed. If animals starved to death, they were allowed to either rot where they dropped or were dragged into these open pits. There were 63 dead horses lying around the property and in open pits. That is something that you just don't forget. But, because of the way the law was written, the judge in that case did not, because he felt like he could not, [prohibit] those people from obtaining additional livestock. And of course, *** it is just a matter of time, assuming those people continue to live there, before they have to go out and do the same thing again. And those individuals in Harney County had previous convictions in Nebraska and Texas for doing the very same thing. Had this bill been in effect at the time, then that judge could have shut them down. But now, like I said, it may just be a matter of time before we're called out there to do the same thing."
Id .
The preceding history confirms our understanding that the principal purpose of the legislation that was codified as ORS 167.332(1) was to protect individual animals from further abuse and neglect, and to deter animal abuse and neglect in the first place. The prohibition on possessing a particular genus of animal was designed so that the possession ban is customized to protect the particular class of animals against which the defendant's crime was committed, not to protect the public generally as defendant argues before us. Thus, we conclude that the "legislature intended to directly protect [animals] by way of the criminal proscription." Moncada , 241 Or. App. at 212, 250 P.3d 31.
In sum, the text, context, and legislative history of ORS 167.332(1)(a) reveals that the legislature intended to restrict the possession of animals by individuals whose *101 conduct demonstrates an identifiable threat to a particular genus of animal. In this case, the gravamen of the crime was the possession of miniature horses and domestic animals as defendant's prior conduct had demonstrated an identifiable threat to those particular animals. ORS 167.332(1)(a) was the mechanism that the legislative assembly provided for the protection of 11 miniature horses, "multiple cats," and a dog because, as discussed above, that statute was enacted to protect individual animals from experiencing "pain, stress, fear and suffering." ORS 167.305(2). Because we conclude that the legislature intended each unlawfully possessed animal to be a separate victim, the trial court did not err when it entered 13 separate convictions for unlawful possession of an animal.
Affirmed.

ORS 167.332(1)(a) (2013), provided, in part, that "a person convicted of [animal neglect in the second degree,] *** [ORS] 167.325, *** may not possess a domestic animal or any animal of the same genus against which the crime was committed for a period of five years following entry of the conviction." For consistency, we refer to the 2013 version of Oregon's laws related to offenses against animals-the law that applied when defendant committed the offenses-throughout this opinion.

We reject without discussion the state's contention that defendant failed to preserve her merger arguments.

Although Nix was vacated, we have since adopted its reasoning, as noted later in this opinion. 294 Or. App. at ----.

First-degree animal abuse is elevated from a Class A misdemeanor to a Class C felony if the person committing the animal abuse has a prior conviction for certain offenses committed against a minor child or involving domestic violence, first-degree animal abuse, first-degree aggravated animal abuse, or if the person commits the animal abuse in the immediate presence of a minor child. ORS 167.320(4).

All of the offenses listed under ORS 167.332(1)(b) are Class C felonies.

In 2015, the legislature made the crime of sexual assault of an animal a Class C felony and included that crime in the list of crimes that result in a 15-year prohibition on possessing animals. Or. Laws 2015, ch. 324, §§ 3-4.

See Audio Recording, House Committee on Judiciary, Subcommittee on Criminal Law, SB 230, May 17, 2001, at 01:00:00 (comments of Sen. Ryan Deckert), http://records.sos.state.or.us/ORSOSWebDrawer/Record/4131573# (accessed Sept. 5, 2018) ("We have other language in here dealing with juveniles *** and requiring a psychiatric evaluation *** because *** once a juvenile starts severely abusing an animal *** the chances that that person will then abuse women in marriage is 60-70 percent of domestic violence abusers first abuse an animal."); id . at 51:50 (comments of Sharon Harmon) ("We know that people that abuse animals often go on to abuse people. We know that people *** that abuse women and children often abuse animals. And it's time to really relate those statutorily, and Senate Bill 230 provides that provision particularly with section eight.").

The Senate Committee on Judiciary held the March 25 public hearing on SB 6 at the same time as Senate Bill (SB) 698. Deputy Bartholomew testified in support of SB 6 and SB 698 at that hearing. Both bills increased the penalties for animal neglect in certain circumstances and added a prohibition on possessing an animal of the same genus against which the underlying crime was committed. SB 698 included only the provisions related to the increased penalties and the prohibition on possessing an animal of the same genus, and died in committee upon adjournment of the legislature. After noting that the provisions of SB 698 were included in SB 6, the Senate Committee on Judiciary voted to move SB 6, which included other provisions related to the animal cruelty laws, out of committee. Audio Recording, Senate Committee on Judiciary, SB 6, Mar. 25, 2013, at 1:06:10 (comments of Floyd Prozanski), http://oregon.granicus.com/MediaPlayer.php?clip_id=1931 (accessed Sept. 5, 2018).